**UNITED STATES, Appellee,**

v.

**John J. MAGUIRE,**
**Defendant, Appellant,**

**UNITED STATES, Appellee,**

v.

**Thomas M. KAVANAGH,**
**Defendant, Appellant,**

**UNITED STATES, Appellee,**

v.

**Robert A. HICKEY,**
**Defendant, Appellant.**

**Nos. 89–1814, 89–1818 and 89–2098.**

United States Court of Appeals,
First Circuit.

Heard Sept. 12, 1990.

Decided Nov. 2, 1990.

Carolyn Grace, with whom Luisa Marques and Shapiro, Grace & Haber, Boston, Mass., were on brief, for defendant, appellant Maguire.

Joan Lieberman, Boston, Mass., for defendant, appellant Kavanagh.

Richard D. Glovsky, with whom Daniel S. Tarlow, James A. Janda and Glovsky &

Associates, Boston, Mass., were on brief, for defendant, appellant Hickey.

S. Theodore Merritt, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before TORRUELLA, Circuit Judge, BOWNES, Senior Circuit Judge, and CYR, Circuit Judge.

BOWNES, Senior Circuit Judge.

These are consolidated appeals from convictions on jury verdicts rendered in two separate criminal trials involving four defendants. Three defendants, John J. Maguire, Thomas M. Kavanagh and Robert A. Hickey, appeal.

On October 18, 1988, four men participated in an armed robbery of a branch of the Bank of New England, One Rockdale Street, Braintree, Massachusetts. Maguire and Kavanagh were arrested by Braintree police seventeen minutes after the robbery. On October 20, 1988, Hickey surrendered in response to an arrest warrant. On November 11, 1988, a federal grand jury returned a three-count indictment charging Maguire, Kavanagh and Hickey with violating 18 U.S.C. § 371 (conspiring to commit armed bank robbery), 18 U.S.C. §§ 2113(d) and 2 (armed bank robbery and aiding and abetting), and 18 U.S.C. § 924(c) (using a firearm during a crime of violence).

On December 19, 1988, a superseding indictment added Count Four, charging Maguire and Kavanagh under 18 U.S.C. § 922(g)(1) (being convicted felons in possession of firearms) and added a fourth defendant, William Ferreira, in the first three counts. The district court denied all suppression motions but granted Hickey a separate trial to avoid a potential *Bruton* problem. On January 31, 1989, defendants Maguire and Kavanagh filed an unopposed motion to sever Count Four.[1]

After a four-day jury trial, Maguire, Kavanagh and Ferreira were convicted on all three counts. Hickey was also adjudged guilty on the three counts in a subsequent jury trial. All three filed timely notices of appeal.

The issues on appeal are (1) whether the district court erred in determining that there was not only reasonable suspicion to stop and frisk Maguire and Kavanagh but probable cause to arrest them, (2) whether the district court erred in refusing to suppress, *inter alia*, two firearms seized along with a programmed police scanner and batteries from the trunk of Maguire's car in an allegedly unconstitutional warrantless search, (3) whether the district court erred in failing to suppress unMirandized statements made by Maguire at the time of his arrest, (4) whether the district court erred in permitting into evidence both in-court and out-of-court identification of the defendants based on impermissibly suggestive photographs, (5) whether the district court's inadvertent remarks regarding the severed firearms count during *voir dire* and comments on the evidence during jury instruction constituted harmful error. We affirm all three convictions.

## I. BACKGROUND

The testimony of witnesses at the suppression hearings and the trials establishes the following: on October 18, 1988, at approximately 12:30 p.m., three men wearing nylon stocking masks robbed a branch of the Bank of New England at One Rockdale Street, Braintree, Massachusetts, a federally insured bank. Two men vaulted the counter and seized cash from the tellers' drawers. The smaller man (identified as John Maguire) was armed with a small handgun and shoved a teller into a closet. A third robber, identified as Thomas Kavanagh, brandished a large, long-barreled gun in the lobby. In approximately two minutes, the three robbers left with $29,985.45 in cash and fled in a waiting Buick. Driven by a fourth man, the tan Buick had license plate 823–KBC, which was noted by both bank employees and customers.

---

1. The record does not reflect when or if this severance motion was granted. Both the defendants and the government believed that the court had so acted by the time of trial and proceeded on this assumption.

A silent alarm notified Braintree police who, in turn, reported the robbery in progress over the police radio. Off-duty Detective Lieutenant Donald Murphy, a sixteen-year veteran officer of the Braintree Police Department, heard this report while at home. Officer Murphy knew from experience that the South Shore Plaza, which is less than one mile from his home and from the Bank of New England, had been utilized to switch and dump getaway cars used in previous robberies. He immediately drove towards the plaza in his private unmarked truck.

En route he heard another police radio transmission stating that three armed males were fleeing by car from the bank. Murphy assumed that the bank robbers were white because no identifying race was mentioned and also assumed that there was a fourth man, a getaway driver. As he drove along Common Street on his way to the Plaza, Murphy saw four men, each carrying a bag, descending an embankment to his right. This embankment, divided by a fence through which the men crawled, is immediately adjacent to an expressway, Route 128. The only way a person could get from the expressway to the South Shore Plaza on foot is by clambering down the embankment. Within an hour a tan Buick, which turned out to be the original getaway car, was found abandoned on the expressway about 20 yards from where the men had descended the embankment.

Lieutenant Murphy saw the men brush off their pants and neaten their hair as they stopped before crossing Common Street, which separates the embankment from the Plaza. As Murphy was stopped in traffic, the four men walked between six and ten feet in front of his truck, allowing him both full face and side profile views. They conferred briefly, split into pairs and went to two vehicles in the parking lot of the Plaza: a blue Oldsmobile, license plate 820RMP, and a gray Hyundai, license plate 599MIX. Each man placed the bag he was carrying in a car trunk. Murphy noted that one blue and tan bag looked heavy, as though it contained contraband. Carried by John Maguire, it was placed in the blue car along with a brown paper bag carried by Thomas Kavanagh. Murphy decided to follow the blue Oldsmobile. Before doing so, he drove into the parking lot to record both license plates and view again the two men in the gray car. Murphy radioed for backup.

As he followed the blue car, he saw both men bend over as if changing shoes and the driver swerve as he changed jackets. Suddenly the driver, identified as John Maguire, made an abrupt U-turn into a gas station; Officer Murphy held up his police radio to inform Maguire that he was being followed. At this point, Maguire reversed his car as if to escape when he was confronted by the back-up cruiser. The driver of that car, Officer Robert Smith, alighted, drew his gun and ordered Maguire to stop. Maguire and Kavanagh were ordered out of their car and patted down. Maguire asked what the problem was. In response to a question by Murphy, he denied he had been at the South Shore Plaza.

Officer Murphy quickly made a sweep of the car and opened the trunk. He felt two loaded guns in the blue and tan bag and found a radar detector and police scanner in the brown paper bag. Maguire responded negatively when asked if he or Kavanagh had a permit for the guns. The two were then arrested, given *Miranda* warnings, transported to the Braintree police station, booked and photographed.

## II. PROBABLE CAUSE

Defendants have challenged the district court's findings of probable cause both for lawful arrest and for search and seizure of the evidence found in the blue Oldsmobile. Our exploration of probable cause proceeds on several levels.

First, we examine the district court's determination of probable cause and its denial of defendants' motions to suppress the evidence seized. We look at the facts in the light most favorable to the court's ruling and accept its findings unless they are clearly erroneous. *See United States v. Moscatiello*, 771 F.2d 589, 596 (1st Cir. 1985); *United States v. Patterson*, 644 F.2d 890, 894 (1st Cir.1981); 3 C. Wright,

Federal Practice and Procedure § 678, at 805 & n. 24 (2d ed. 1982). Probable cause exists when " 'the facts and circumstances within [the police officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense.' " *United States v. Figueroa,* 818 F.2d 1020, 1023 (1st Cir.1987) (quoting *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1983)).

This court, as well as the district court, must consider the totality of circumstances to evaluate the government's demonstration of sufficient " '[p]robability ... of criminal activity.' " *Illinois v. Gates,* 462 U.S. 213, 235, 103 S.Ct. 2317, 2330, 76 L.Ed.2d 527 (1983) *quoted in United States v. Jorge,* 865 F.2d 6, 9 (1st Cir.), *cert. denied,* 490 U.S. 1027, 109 S.Ct. 1762, 104 L.Ed.2d 198 (1989). Because there are " 'so many variables in the probable cause equation,' " probable cause findings are not invariably bound by precedent. *Id.* 462 U.S. at 238 n. 11, 103 S.Ct. at 2332 n. 11 *quoted in Jorge,* 865 F.2d at 9 n. 1. *"Probability* is the touchstone.... [The] government need not show 'the quantum of proof necessary to convict.' " *Jorge,* 865 F.2d at 9 (quoting *United States v. Miller,* 589 F.2d 1117, 1128 (1st Cir.1978)).

■ Given the facts, we find that there was probable cause to arrest even before the search of the car and its trunk. The entire, tightly forged chain of circumstances had a number of links. It began with Lieutenant Murphy's hearing of the armed robbery on his police radio, continued with his first sighting the four fleeing men just two minutes later and his following them to the Plaza, then culminated in the arrests of Maguire and Kavanagh within seventeen minutes of Officer Murphy's first hearing of the robbery.

The close proximity of the robbed bank to the expressway, the proximity of the expressway to the place where the men were on the embankment, and the proximity of that place to the South Shore Plaza are all significant. These proximities contribute to a finding of probable cause.

Murphy's knowledge of the robbery, his knowledge of other robbers' changing cars at the Plaza, and his experience and expertise as a police officer were also crucial factors in the probable cause determination. *See* 1 LaFave, Search and Seizure 570–575 (2d ed. 1987) (crediting police expertise as contributing to objective standard for probable cause). Officer Murphy's police expertise and experience prompted him to drive to the shopping plaza. His observations en route and in the plaza were sharpened by his expertise and experience: he saw four men clambering down the embankment which separated the expressway from the plaza; he saw them go directly to two parked cars in the plaza; each man was carrying a bag; and the bags were put in the trunks of the cars after a brief conference.

Before the four drove away in the two cars, Officer Murphy had been able to view each man as he passed in front of his truck and to assess the possible contents of the bags, especially the blue and tan bag which he surmised contained guns and/or money because of its shape and weight. Thus, even before Murphy followed the blue Oldsmobile, he had far more than a "hunch" to go on. He had "specific and articulable facts which, taken together with rational inferences from those facts," could create at least reasonable suspicion for a *Terry* stop of the car. *Terry v. Ohio,* 392 U.S. 1, 21, 27, 88 S.Ct. 1868, 1879, 1883, 20 L.Ed.2d 889 (1968). At this juncture, a trained law enforcement officer could have found "objective justification" for such "a brief detention short of traditional arrest." *United States v. Mendenhall,* 446 U.S. 544, 551, 100 S.Ct. 1870, 1875, 64 L.Ed.2d 497 (1980) (citing *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969)).

Officer Murphy followed the blue car, which held the blue and tan bag, when the two secondary getaway vehicles diverged. In transit, the officer observed further suspicious activity: both men in the blue car changing shoes; the driver changing his jacket. Finally, Maguire, the driver, made an abrupt U-turn into a gas station. When Murphy revealed his identity by holding up

his police radio, Maguire made a brief attempt to flee. This was prevented by the back-up cruiser.

*Terry Stop or Arrest*

After Maguire's blue car came to a final stop, both officers left their vehicles and forced Maguire and Kavanagh from their car. Whether this was a *Terry* stop, or a de facto arrest, or a *Terry* stop rapidly escalating into an arrest is not easily determined. Supreme Court decisions of the last decade document considerable ambiguity, indeed, sometimes controversy, over the need for or definition of a bright line distinction between a *Terry* stop and an arrest. *See, e.g., United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985) (admonishing courts not to "indulge in unrealistic second guessing" about whether an arrest occurred or should have occurred when "the police are acting in a swiftly developing situation"); *Arkansas v. Sanders,* 442 U.S. 753, 768, 99 S.Ct. 2586, 2595, 61 L.Ed.2d 235 (1979) (Burger, C.J., concurring) (refusing to draw bright lines and insisting that the courts are "construing a Constitution, not writing a statute or a manual for law enforcement officers"), *modified by United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) (holding that warrantless search can be accomplished with legitimate stop short of arrest if there is probable cause to believe contraband in vehicle).

It seems settled that the use of guns and the presence of more than one police officer do not necessarily convert a *Terry* stop into a de facto arrest. *United States v. Trullo,* 809 F.2d 108, 113 (1st Cir.), *cert. denied,* 482 U.S. 916, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987); *United States v. Streifel,* 781 F.2d 953 (1st Cir.1986). Factors which can cumulatively create an arrest include extending the duration of the stop and blocking the defendants' exit in any manner so that a reasonable person would not feel free to leave. A recent First Circuit opinion, however, overturned a district court holding that a *Terry* stop had escalated into an arrest and ruled that an arrest occurs only in a situation imposing " 'restraints comparable to those of a formal arrest.' " *United States v. Quinn,* 815 F.2d 153, 155–56 (1st Cir.1987) (quoting *Berkemer v. McCarty,* 468 U.S. 420, 441, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984)).

In this case, there is little doubt that Maguire and Kavanagh, both held at gunpoint and handcuffed, were not free to leave. We agree with the district court that Officer Murphy and his back-up officers had more than the "articulable and reasonable suspicion" requisite for a *Terry* stop. We hold (without considering the evidence found in the trunk) that when the police took the defendants from the car, the police possessed sufficient facts to constitute probable cause necessary for a formal arrest.

## III. FOURTH AMENDMENT ISSUES

### A. *Search Incident to Arrest*

█ Because the officers had probable cause to stop the car and arrest the defendants, they could also search and seize both the defendants and the contents of the passenger compartment of the car. The sneakers and other objects of clothing were in plain view and in the area within the defendants' immediate control in the car. They were properly seized incident to the arrest. *Jorge,* 865 F.2d at 9 (citing *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969); *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981)). Further, the officers were justified in making a search of the interior of the vehicle to look for concealed weapons or destructible contraband. *United States v. Bautista,* 731 F.2d 97, 99 (1st Cir.1984). *Bautista* also establishes the legality of such a search even if the defendants are outside the car. *Id.* at 99.

### B. *Search of Vehicle for Contraband*

"The right to search and the validity of the seizure are not dependent on the right to arrest. They are dependent on the reasonable cause the seizing officer has for belief that the contents of the automobile offend against the law." *Chambers v. Maroney,* 399 U.S. 42, 49, 90 S.Ct. 1975, 1980, 26 L.Ed.2d 419 (1970) (quoting *Carroll v.*

*United States*, 267 U.S. 132, 158–59, 45 S.Ct. 280, 287, 69 L.Ed. 543 (1925)).

▪ Recent cases in several circuits including our own confirm the probable presence of contraband, not just the arrest itself, as a requisite for search of the entire vehicle. In *United States v. Moscatiello*, 771 F.2d at 600, we held that when probable cause existed to believe a truck was used to transport contraband, the *entire* truck could be searched and seized. Following closely the holding of the Supreme Court in *United States v. Ross*, 456 U.S. at 825, 102 S.Ct. at 2173, we sanctioned a search of "the entire vehicle, including, the examination of any closed container that may conceal the object of the search...." *Moscatiello*, 771 F.2d at 600. *See also United States v. Schecter*, 717 F.2d 864 (3d Cir.1983) (holding that driver's drugged state provided probable cause to search vehicle for contraband); *United States v. Martin*, 690 F.2d 416 (4th Cir.1982) (upholding warrantless vehicular search for contraband based on informant's tip); *United States v. Burns*, 684 F.2d 1066, 1073 (2d Cir.1982) (upholding complete vehicular search once probable cause established for custodial arrest with contraband), *cert. denied*, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983).

▪ In this case, Officer Murphy had reasonable cause to believe that Maguire's car carried contraband, items used in or resulting from the bank robbery. He had seen the bags carried by the fleeing suspects and saw these bags placed in the cars. He had surmised that the heavier blue and tan bag contained guns and/or money. Though the bags were in the trunk and not in the passenger compartment of the car, there was reasonable cause for the police to believe the two bags contained implicating evidence of the bank robbery; such evidence would be contraband.

This case can be distinguished from both *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) and *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, in which the pursuing officers' foci were exclusively on the containers placed in the vehicles. *Sanders* states succinctly: "Here, as in *Chadwick*, it was the *luggage* being transported by respondent at the time of the arrest, not the automobile in which it was being carried, that was the suspected locus of the contraband. The relationship between the automobile and the contraband was purely coincidental, as in *Chadwick.*" *Sanders*, 442 U.S. at 767, 99 S.Ct. at 2595 (Burger, C.J., concurring).

In the instant case, the relationship between the blue car and the contraband was scarcely coincidental. The car had been left by design at the South Shore Plaza for later use, as Murphy surmised and defendants Hickey and Kavanagh testified at the suppression hearing. The car might even have carried contraband *before* the robbery; Hickey testified that the scanner was put in Maguire's car when it was first parked at the Plaza. As one of two pre-arranged replacements for the abandoned getaway car, the blue car itself contributed to probable cause as an instrumentality of the crime. It was not simply a repository for contraband.

### C. *Automobile Exception for Warrantless Search*

▪ *Ross* clarifies and limits both *Chadwick* and *Sanders* by concluding that the auto exception sanctions a warrantless search of the entire vehicle when "probable cause exist[s] to search the entire vehicle." *Ross*, 456 U.S. at 814, 102 S.Ct. at 2167. *Carroll* also holds that a vehicular search for contraband could proceed without a warrant if probable cause existed. *Carroll*, 267 U.S. at 149, 45 S.Ct. at 283. This rule was confirmed in *Chambers*, which underlines the mobility of an automobile and distinguishes such a search from a warrantless search of home or office. *Chambers*, 399 U.S. at 47–48, 90 S.Ct. at 1979–1980.

*Ross* further defines the terms of a warrantless search regarding both scope and probable cause. It holds that such a search must be supported by the same objective facts that would justify a warrant. The "scope of the search is defined by the object of the search and the places in which

there is probable cause to believe that it may be found." *United States v. Santana,* 895 F.2d 850, 853 (1st Cir.1990) (citing *Ross,* 456 U.S. at 809, 820–24, 102 S.Ct. at 2164, 2174–73). Excluding a closed container from a warrantless search could, in fact, increase the fourth amendment problem of intrusion and contradict the holdings of *Carroll* and *Chambers:*

> [P]rohibiting police from opening immediately a container in which the object of the search is most likely to be found and instead forcing them first to comb the entire vehicle would actually exacerbate the intrusion on privacy interests. Moreover, ... in every case in which a container was found, the vehicle would need to be secured while a warrant was obtained. Such a requirement would be directly inconsistent with the rationale supporting the decisions in *Carroll* and *Chambers.*

*Ross,* 456 U.S. at 821, n. 28, 102 S.Ct. at 2171, n. 28.

Admittedly, the blue car was subsequently impounded and might have been searched at leisure. But a warrantless contemporaneous search of the entire vehicle based on probable cause to search both the car and its containers does not offend the Constitution. *See, e.g., Chambers,* 399 U.S. at 51–52, 90 S.Ct. at 1981–82 (upholding the constitutionality of a warrantless search three days after arrest). The Supreme Court held in *Sanders* that "the Constitution does not require a search warrant ... when the police *stop an automobile on the street or highway* because they have probable cause to believe it contains contraband or evidence of a crime." *Sanders,* 442 U.S. at 760, 99 S.Ct. at 2591 (emphasis added).

■ In this case, Lieutenant Murphy had good reason to suspect that the blue car carried possible contraband. Murphy's subsequent search fulfilled both the meaning and purpose of the automobile exception which is based on: "the mobility of automobiles, the potential of flight, the need to prevent a lost opportunity, the possibility of discovering contraband in transit...." *Santana,* 895 F.2d at 853. *See*

*also California v. Carney,* 471 U.S. 386, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985) (upholding warrantless search of parked motor home because of its potential mobility). *But see Coolidge v. New Hampshire,* 403 U.S. 443, 462, 91 S.Ct. 2022, 2036, 29 L.Ed.2d 564 (1971) (holding that auto exception inapplicable to car parked in private driveway).

### D. *Defendant's Standing to Suppress Evidence from Warrantless Search*

■ Defendant Hickey was granted standing by the district court to appeal the seizure of his property—a police scanner and batteries stashed in the trunk of the car driven by Maguire. Hickey was neither owner, driver nor passenger in that car. Recent First Circuit precedent holds that under these circumstances, the defendant has no reasonable expectation of privacy in the area searched—the trunk of another's car. *See, e.g., United States v. Aguirre,* 839 F.2d 854 (1st Cir.1988) (denying standing because defendant neither owned, leased, nor possessed keys to car); *United States v. McHugh,* 769 F.2d 860, 864 (1st Cir.1985) (disallowing standing when defendant neither owned, operated nor possessed the truck when seized); *United States v. Lochan,* 674 F.2d 960, 965 (1st Cir.1982) (citing factors relevant to privacy expectation including presence in area, possession, ownership, ability to control).

Having found probable cause for search under the automobile exception, we need not determine the standing question. Hickey cannot prevail since we have found probable cause for the search and seizure of the entire vehicle as well as any closed containers therein. A police scanner with batteries, properly programmed, in close proximity to two loaded guns, can itself be deemed an instrumentality of an ongoing crime. *Ross,* 456 U.S. at 809, 102 S.Ct. at 2164. *See also Santana,* 895 F.2d at 851–52.

### IV. *MIRANDA* WARNINGS

■ For more than 30 years an arrest involving custodial restraint and interrogation has required warning of fifth amend-

ment rights against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We deem the coercive holding of Maguire and Kavanagh to have been an arrest based on probable cause. If the arrest began as a *Terry* stop, there would have been no need initially for *Miranda* warnings. *See Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (concluding without dissent that no *Miranda* warnings required for brief seizure and detention). Hence, *Miranda* would necessarily be invoked *only* if there were custodial interrogation at the time of arrest. *See United States v. Masse*, 816 F.2d 805 (1st Cir.1987) (delineating factors necessary to require *Miranda* warnings).

To ascertain the necessity of *Miranda* warnings, we examine the record of the second day of trial. The transcript includes a discussion of Kavanagh's *Miranda* rights by his defense attorney and the district court judge after which it was concluded that Kavanagh had remained silent. The issue, therefore, involves only Maguire.

The colloquy between Maguire and Officer Murphy was very brief. Officer Murphy's testimony was that Maguire initiated the dialogue by asking "what the problem was." Murphy then made one assertion and asked one question. He stated that he had seen Maguire at the South Shore Plaza. Maguire denied having been there. Murphy then asked if Maguire or Kavanagh had a permit for the guns found in the blue and tan bag in the trunk. Maguire said that they did not.

Even if Maguire's answer should have been suppressed under *Miranda*,[2] the district court's error was harmless. The guns could still have been seized in a search under the automobile exception to the warrant requirement. *See Ross*, 456 U.S. at 823–24, 102 S.Ct. at 2172–73; *Chambers*, 399 U.S. at 49, 90 S.Ct. at 1980; *Santana,*

895 F.2d at 851–52. The arrests of the defendants were based on probable cause for believing that they robbed a bank, not that they illegally possessed firearms.

## V. IDENTIFICATION ISSUES

### A. *Defendant Hickey*

The district court refused to suppress four out-of-court identifications and one in-court identification of Hickey, all made by Officer Murphy. The jury in Hickey's trial, which had been severed from that of the other three defendants, found Hickey guilty on all counts.

#### 1. *Out–of–Court Identifications*

The first two identifications which the defense claimed were impermissibly suggestive were based upon photospreads. They were made at Area A police headquarters in Boston on October 18, 1988, the day of the robbery, and at the FBI office on the following day. The third and fourth out-of-court identifications were show-up identifications in which the defendant alone was present for booking at the police station in Braintree on October 20, 1988, and as a federal prisoner on October 26, 1988.

The defense has stressed the impermissible aspects of any showup in which a single defendant is presented to a single witness. Lieutenant Murphy, however, had already twice selected with certainty Hickey's picture from two separate and distinct photospreads *before* these showups. Hence we review only the suggestiveness of the photo arrays as they affect later identifications, not the reverse. Although Officer Murphy insisted on booking Hickey personally in Braintree on October 20 and being present at the federal booking on October 26, 1988, these show-up identifications were incidental to the earlier photospread identifications.

---

**2.** We do not decide whether Maguire's question evinced a willingness to talk to the police without fifth amendment protections. *See Judd v. Vose*, 813 F.2d 494, 497 (1st Cir.1987) (citing *Edwards v. Arizona*, 451 U.S. 477, 486 n. 9, 101 S.Ct. 1880, 1885 n. 9, 68 L.Ed.2d 378 (1981)).

*See also Oregon v. Bradshaw*, 462 U.S. 1039, 1045–46, 103 S.Ct. 2830, 2834–35, 77 L.Ed.2d 405 (1983) (noting defendant's initiating conversation as indicating willingness to engage in "generalized discussion about the investigation").

The October 18, 1988, identification by Officer Murphy at Area A was based on five photos of white males of similar age and appearance. Murphy was not told that Hickey was among them; he was informed that the photos depicted associates of Maguire and Kavanagh. Murphy selected Hickey's photo without any influence from the other officer in the room, Detective Patrick McDonough, and without turning over the pictures to note names written on the back.

The FBI photospread on the following day comprised six photos, an adequate number according to a recent First Circuit case, *United States v. Turner,* 892 F.2d 11, 14 (1st Cir.1989). Here Murphy picked out a different photo of Hickey arrayed with different subjects. A suspect's inclusion in two photospreads, even with the same photo, is not constitutionally impermissible. *Perron v. Perrin,* 742 F.2d 669, 675 (1st Cir.1984); *United States v. Eatherton,* 519 F.2d 603, 608 (1st Cir.), *cert. denied,* 423 U.S. 987, 96 S.Ct. 396, 46 L.Ed.2d 304 (1975).

In both these instances, Officer Murphy selected Hickey's photo before viewing him alone at the later bookings. Both of Murphy's photo identifications were made with certainty, backed by his sixteen years of police experience and expertise, as well as his knowledge of future court proceedings in which his identifications would be utilized. Most importantly, both were based upon two viewings of the suspect in broad daylight when Hickey did not know he was being observed. As Officer Murphy was stopped on Common Street in his unmarked private truck, he viewed Hickey in full face and in profile as he came down the embankment from Route 128 and passed within six to ten feet in front of Murphy. The officer had another unfettered view of Hickey from the cab of his truck when he drove into the South Shore Plaza, watched all four suspects load their bags into the trunks of their respective cars, and saw Hickey drive away in the gray Hyundai. *See United States v. Fields,* 871 F.2d 188, 195 (1st Cir.) (disavowing suggestivity of identification when

witness was "experienced police officer" viewing suspect twice in "complete daylight"), *cert. denied,* —— U.S. ——, 110 S.Ct. 369, 107 L.Ed.2d 355 (1989).

In *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) the Court fashioned a two-pronged test for the exclusion of identifications based upon impermissibly suggestive photo arrays. The first prong involves determination of whether the identification procedure was impermissibly suggestive. If it was not, the court need proceed no further in its inquiry. This conclusive standard has been employed numerous times to terminate exclusionary inquiry in the First Circuit. *See, e.g., United States v. Alexander,* 868 F.2d 492, 495 (1st Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 507, 107 L.Ed.2d 509 (1989); *Fields,* 871 F.2d at 195; *Perron,* 742 F.2d at 675 & n. 5; *Gullick v. Perrin,* 669 F.2d 1, 6 (1st Cir.1981).

The second prong of *Simmons,* invoked only when a photospread has been deemed impermissibly suggestive, measures the reliability of the identification based on the totality of the circumstances according to a five-point index delineated in *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382–83, 34 L.Ed.2d 401 (1972) (witness's opportunity to view the suspect, degree of attention, accuracy of prior description, level of certainty, and time lapse between crime and identification). *See also Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977) (concluding that reliability is the "linchpin" in ascertaining admissibility of identification evidence); *United States v. Bouthot,* 878 F.2d 1506, 1514 (1st Cir.1989) (applying the second prong of "two-part test that is followed in this Circuit" after determining identification was impermissibly suggestive).

In this case, even were we required to apply the five-point analysis of *Neil v. Biggers,* Lieutenant Murphy's first two out-of-court identifications would have satisfied the reliability index in terms of opportunity to view suspect, degree of attention, level of certainty, and minimal time lapse between crime and identification of suspect.

Even Murphy's delineation of certain specific physical details, such as the variation in the length of Hickey's hair from the photo to the time of the crime, would fulfill the *Neil v. Biggers* test in the First Circuit. *See, e.g., United States v. Lau*, 828 F.2d 871, 875 (1st Cir.1987) (accepting identification evidence with minimal physical detail and small miscalculations in height estimates), *cert. denied*, 486 U.S. 1005, 108 S.Ct. 1729, 100 L.Ed.2d 194 (1988).

Suggestivity in photo identification becomes impermissible only if it induces a "very substantial likelihood of irreparable misidentification." *Simmons*, 390 U.S. at 384, 88 S.Ct. at 971. The First Circuit has expanded the range of permissibility to condone basing a photo array on suspicion regarding a particular defendant (*Gullick*, 669 F.2d at 4) and suggesting that the suspect is one of those shown in the array. *Turner*, 892 F.2d at 14.

According to *Simmons*, the danger of misidentification can be countered even when some element of suggestivity exists. The identification is still admissible, especially if it has been made under severe constraints when a "serious felony has been committed" and the "perpetrators are still at large." *Simmons*, 390 U.S. at 384, 88 S.Ct. at 971. Defendant Hickey was one of two robbers still at large after the armed bank robbery when Lieutenant Murphy made the photospread identifications on the day of the robbery and the following day.

If minimal suggestivity exists in pre-trial identification, it may be cured at trial. Cross-examination before a jury can establish reliability of identification:

> [U]nder our adversary system of justice, cross-examination has always been considered a most effective way to ascertain the truth. We decline in these cases to hold that the Due Process Clause of the Fourteenth Amendment inevitably requires the abandonment of the time-honored process of cross-examination as the device best suited to determine the trustworthiness of testimonial evidence.

*Gullick*, 669 F.2d at 5 (quoting *Watkins v. Sowders*, 449 U.S. 341, 349, 101 S.Ct. 654, 659, 66 L.Ed.2d 549 (1981)).

Conforming to Supreme Court precedent, we have held that "it is only in extraordinary cases that identification evidence should be withheld from the jury." *Turner*, 892 F.2d at 14. *See also Gullick*, 669 F.2d at 4, n. 8 (insisting that "we adhere to the established view that reliability is generally a jury question, unless the district court finds evidence of suggestivity...."). For example, in *Manson v. Brathwaite*, 432 U.S. at 116, 97 S.Ct. at 2254, a case also based on admissibility of identification evidence by a police officer, the Court maintained its faith in jury decisions: "We are content to rely upon the good sense and judgment of American juries.... Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature."

Here, the district court found no evidence of suggestivity and denied defendants' motions to suppress the identification evidence. Moreover, separate juries found both Hickey and Kavanagh, who had raised these identification issues, guilty on all counts in separate trials. Hence we endorse the district court's denial of Hickey's suppression motion and the verdict reached by the jury after it had weighed the admissible evidence. Hickey's due process rights were not violated by the admission of Officer Murphy's out-of-court identifications.

### 2. *In–Court Identification*

■ The Supreme Court has declared generally the same test for the admissibility of an in-court identification subsequent to a suggestive out-of-court identification as it has employed for admission of an allegedly suggestive pretrial out-of-court identification. In other words, in-court identification testimony is admissible *unless* its basis, the pretrial identification, has proven so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification. *Biggers*, 409 U.S. at 198, 93 S.Ct. at 381. *See also Simmons*, 390 U.S. at 384, 88 S.Ct. at 971 (adding the word "irreparable" to define the level of misidentification required to exclude out-of-

court identification); *Turner*, 892 F.2d at 14 n. 2 ("[b]ecause we hold that the out-of-court photospread identifications were properly admitted into evidence, we need not address defendant's contention that an in-court identification of him ... was inadmissible because it could not be shown to have had an independent source"). Here, we have found the pretrial identification admissible; thus, the in-court identification of Hickey based upon it must be admitted.

## B. *Kavanagh's Identification*

■ As to this defendant, there was no explicit in-court identification. A bank teller, Cynthia Dugan, who had viewed several pre-trial photo arrays, simply said that Kavanagh's picture looked like the man in the lobby. The district court did, however, allow into evidence the two photo arrays contested by the defense. From these two photospreads, each containing a different picture of appellant Kavanagh, witness Dugan twice selected Kavanagh. Two other bank employees were unable to pick him out from any of the photographs.

Ms. Dugan was initially shown seven different photographs of seven white males of approximately the same age. Although she knew two men had been arrested, she was not told that a picture of either suspect was in the photospread. Nor was she otherwise influenced in any way. In the first photospread she selected Kavanagh, the only suspect attired in a sleeveless undershirt; however, two other suspects were shirtless. When she noted that the robber in the lobby of the bank was wearing a dark sweatshirt, she was shown the same photospread with Kavanagh pictured in a blue sweatshirt. Again she selected him, based on his upper torso, his nose and jawline.

The defense claim of impermissible suggestivity in these two photospreads is refuted, ending the inquiry with the first prong of the *Simmons* test, 390 U.S. at 384, 88 S.Ct. at 971. In denying Hickey's appeal on this issue, we have also toppled Kavanagh's appeal. To reprise: it is not impermissible to build a photo array around a particular suspect. *Gullick*, 669

F.2d at 4; *Turner*, 892 F.2d at 14. Inclusion of the same suspect's picture in two different arrays, even inclusion of the same picture of the same suspect, is permissible without undue repetition. *Perron*, 742 F.2d at 675. A six-person photospread has been deemed adequate. *Turner*, 892 F.2d at 14.

Other current cases address specific issues in the defense claims. *United States v. Alexander*, 868 F.2d at 495–96, recently rejected the argument of impermissible subjectivity because only the defendant was wearing an earring in the photospread. *Id.* at 496 (citing *United States v. Thurston*, 771 F.2d 449, 452–53 (10th Cir.1985) (reliable identification where defendant alone had beard and braids)); *United States v. Bice-Bey*, 701 F.2d 1086, 1089–90 (4th Cir.) (reliable identification where defendant only woman with dred locks and head covering), *cert. denied*, 464 U.S. 837, 104 S.Ct. 126, 78 L.Ed.2d 123 (1983).

Also in *Alexander*, the defendant was photographed wearing a hat after a witness recalled that the robber was wearing a hat. The court found this permissible. Kavanagh alone was photographed in an athletic undershirt; he alone was photographed in a dark sweatshirt similar to one which the witness recalled the robber's wearing. The First Circuit stands with other circuits in maintaining that neither is impermissibly suggestive.

Given the lack of suggestivity in the photospreads we need not reach the full second prong of *Simmons*—the five factors of reliability outlined in *Biggers*, 409 U.S. at 199–200, 93 S.Ct. at 382–83. We find, nonetheless, that Ms. Dugan's identification testimony was not constitutionally unreliable. She did have a full, unobstructed view of the "lobby man," Kavanagh, for two minutes and looked directly at him for about a minute under full artificial light. *See Lau*, 828 F.2d at 871 (citing *Manson*, 432 U.S. at 114, 97 S.Ct. at 2253 (reliable identification when witness had two to three minutes to view suspect)); *Judd*, 813 F.2d at 499 (three to five minutes); *Eatherton*, 519 F.2d at 609 (one minute). Moreover, she viewed the two

photospreads on the very day of the bank robbery. *Biggers*, 409 U.S. at 199–200, 93 S.Ct. at 382–83.

There was no external manipulation, impermissible suggestivity, or pattern of unreliability to keep Dugan's identification testimony from the jury. Dugan never conclusively identified Kavanagh as one of the robbers; she only said that he looked like one. The court clearly instructed the jury as to the limits of her testimony, indicating that no actual or positive in-court identification had been made. We reiterate the Court's statement in *Manson*: "We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill." 432 U.S. at 116.

## VI. JURY INSTRUCTION ISSUES

### A. *The Initial Comments*

 Defendants Kavanagh and Maguire next argue that a new trial is required as a result of certain comments made by the district court judge while impanelling the jury. We disagree.

The record reveals the following colloquy:

Court: Now, members of the jury, this case is a criminal case. It's a case brought by the United States against these three defendants, Thomas Kavanagh, John J. Maguire, and William L. Ferreira. And they are charged in several counts with robbing a bank in Braintree and with being felons, several of them, felons in possession of firearms.

Mr. Andrews [Defense Counsel]: Objection, your Honor. May I approach the bench for a moment?

Court: Did I misstate that?

Mr. Andrews: Yes, your Honor.

Court: In what respect?

Mr. Andrews: I believe they are only charged with bank robbery and conspiracy.

Court: I have here a superseding indictment.

Mr. Merritt [Government Attorney]: I believe the count is carrying or using a firearm in the commission of a felony. The counts in this trial, your Honor.

Court: Count 4 is not in this trial? Thomas Kavanagh and John J. Maguire ... exceeding one year ... did knowingly possess a firearm.

Mr. Merritt: That was severed, I believe, your Honor.

Court: I don't believe so.

Mr. Andrews: I think there was a motion. The Government, I know in its response, if memory serves me well, said there was no opposition to that request.

Court: I don't think I made any order of severence, did I?

Mr. Merritt: The court did, orally.

Court: All right. So we can forget about that. Anyway, we have a bank robbery.

Mr. Tacelli [Defense Counsel]: May we approach the bench?

Court: Yes.

A bench conference followed after which the district court denied a motion by counsel for Kavanagh and Ferriera for a new jury pool. Instead, the court gave the following instruction:

Members of the jury, you are to disregard the count that I read out. It has been by agreement with the government that that is not to be part of this case. None of the allegations there will be the subject of evidence and you will not hear any part of that allegation, it is only an accusation, and you are to disregard it entirely in your consideration of the bank robbery case.

Defense counsel did not object to these instructions, and jury selection continued. At the conclusion of the ensuing four-day trial, the district judge, in his charge to the jury, emphasized that an indictment is not evidence.

Appellants argue that the erroneous reading of the severed count destroyed the presumption of innocence, thereby denying the defendants their sixth amendment right to a fair trial. The first question is whether the erroneous comments amounted to constitutional error. If they did, there must be a new trial unless the government

can show that the comments were harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 22–24, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967); *United States v. Williams*, 809 F.2d 75, 81 (1st Cir.1986), *cert. denied*, 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 377 (1987). We agree with defendants that the reference to the severed count was presumptively prejudicial, but we find for several reasons that it did not implicate defendants' sixth amendment constitutional right to a fair trial.

First, the court gave a curative instruction. It was clear and concise. As noted, there were no objections to it. We must assume that the jury understood it and followed it. Second, in its final charge to the jury, the court properly instructed the jury that a defendant's presumption of innocence is not affected by an indictment:

> The presumption of innocence means, among other things, that you are to attach no importance to the fact that an indictment has been returned in this case. That is merely an accusation. It serves to put in motion the process by which we determine guilt after a full hearing of all the evidence. Even though an indictment is returned by a grand jury, the proceedings before that grand jury were limited to an accusation only. This jury, however, has the duty to try the issue of guilt. You notice that I have not said to try the issue of guilt or innocence. A defendant is not required to establish his innocence.

Third, there was no evidence introduced on Count Four. Appellants have mischaracterized the remarks of the court as prejudicial *evidence*. This is not a situation where evidence that might have nullified defendants' presumption of innocence was introduced during trial. The unfortunate comments were made while the jury was being impanelled and were corrected as soon as the court realized it had misspoken. We reject appellants' contention that the court purposely emphasized its first comment by failing to grant the request for a bench conference immediately after the objection was made. Although the dialogue between court and counsel should have

been conducted outside the hearing of the jury, the failure to do so was the result of confusion by the court, not bad faith.

The only fair reading of the record compels a finding that the comments were inadvertent and that as soon as the district court realized its error, it corrected it. Judges, like the rest of humankind, are not perfect; and even one as able and experienced as the district judge in this case may err occasionally. The question is whether this was an error of constitutional magnitude. For the reasons stated, we find that it was not.

The next question is whether the error affected the substantial rights of defendants. *United States v. Ladd*, 885 F.2d 954, 957 (1st Cir.1989). Under Fed.R.Civ.P. 52(a), "[a]ny error ... which does not affect substantial rights shall be disregarded." In *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), the Court put it this way:

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. But if one cannot say, with *fair assurance*, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Id.* at 764–65, 66 S.Ct. at 1247–48 (footnote and citation omitted) (emphasis added). We have equated the "fair assurance" standard of *Kotteakos* with a finding that it is highly probable "that the error did not affect the judgment." *United States v. Ladd*, 885 F.2d at 957; *United States v.*

*Hernandez–Bermudez,* 857 F.2d 50, 53 (1st Cir.1988).

The reasons for our finding that the comments did not amount to constitutional error also militate against a finding that substantial rights were affected: the curative instruction; the lack of any evidence on the severed count; and the final instruction that an indictment does not affect the presumption of innocence that cloaks a defendant make it highly probable that the error did not affect the verdict. This "highly probable" finding is buttressed by the evidence against defendants. We summarize the evidence: Lieutenant Murphy's observations from the time he saw defendants clambering down the embankment to the arrest of Maguire and Kavanagh; the discovery of the first getaway car near the place where defendants descended the embankment; the seizure of the handguns and police scanner from the trunk of the second getaway car; and the identification testimony. In sum, the evidence against defendants was overwhelming. We are constrained to add that even if the comments had risen to the level of constitutional error, they would have been harmless beyond a reasonable doubt.

### B. *The Final Instructions*

■ Next, appellants Maguire and Kavanagh argue that the district court erred in its final instructions to the jury. They contend that the district court's instruction regarding circumstantial evidence amounted to a directed guilty verdict.

The court gave the following instruction:

In this case, the circumstantial evidence is that these four men were found coming down from a direction where the getaway car of the robbers was subsequently found. That they were not traveling in the ordinary commercial pathways to the shopping plaza; that they were carrying bags; that they placed the bags in the car; and that when they were subsequently stopped, one of the bags contained two guns, one of which, at least, matches the description of the gun used in the bank robbery.

Now, *it is for you to decide* whether, on the basis of common sense, common experience and logic, that would warrant a finding beyond a reasonable doubt that those four men were the men who were involved in the robbery. Three men [who] went into the bank and the one that was outside in the getaway car.

Now, *if you are satisfied* that those four men were the robbers, then, you have a relatively easy problem in determining whether Mr. Maguire and Mr. Kavanagh were two of those four men, *if you believe Lieutenant Murphy.* That he followed them, that he had them in his sight as they left the parking plaza, and when he stopped the car and arrested the occupants, that's who they were, Kavanagh and Maguire.

(Emphasis ours).

It is well established that the trial judge is not limited to instructions in the abstract. The judge may explain, comment upon and incorporate the evidence into the instructions in order to assist the jury to understand it in light of the applicable legal principles. *Quercia v. United States,* 289 U.S. 466, 469, 53 S.Ct. 698, 699, 77 L.Ed. 1321 (1933); *United States v. Silvestri,* 790 F.2d 186, 189 (1st Cir.1986). There are, of course, limitations placed on the trial judge's comments.

This privilege of the judge to comment on the facts has its inherent limitations. His discretion is not arbitrary and uncontrolled, but judicial, to be exercised in conformity with the standards governing the judicial office. In commenting upon testimony he may not assume the role of a witness. He may analyze and dissect the evidence, but he may not either distort it or add to it. His privilege of comment in order to give appropriate assistance to the jury is too important to be left without safeguards against abuses. The influence of the trial judge on the jury "is necessarily and properly of great weight" and "his lightest word or intimation is received with deference, and may prove controlling." This Court has accordingly emphasized the duty of the trial judge to use great care that an expression of opinion upon the evidence

"should be so given as not to mislead, and especially that it should not be one-sided"; that "deductions and theories not warranted by the evidence should be studiously avoided."

*Quercia,* 289 U.S. at 470, 53 S.Ct. at 699 (quoting *Starr v. United States,* 153 U.S. 614, 626, 14 S.Ct. 919, 923, 38 L.Ed. 841 (1894)). We do not find that the district court's comments went beyond the boundaries of acceptable judicial instructions. Its discussion of the evidence did not dictate to the jury the conclusion the latter should make. Rather, the court repeatedly emphasized that the final resolution of the issues rested with the jury and that it had the sole responsibility for determining the credibility of the witnesses and finding the facts.

Appellants further argue that the instructions emphasized a taut, logical progression, interweaving the evidence and the counts in the indictment so as to lead the jury directly to a guilty verdict. The appellants take exception to the following:

So there are two stages that you have to go through. First, to determine whether the four men that Lieutenant Murphy saw in the parking lot were the robbers and then proceed to make your conclusion, I would suppose fairly rapidly, after you have gone that far, that Kavanagh and Maguire were among those four people.

We have held that instructions which present the jury with a "logical progression" are forbidden. *United States v. Spock,* 416 F.2d 165, 181 (1st Cir.1969) ("There is no easier way to reach, and perhaps force, a verdict of guilty than to approach it step by step."); *but see United States v. Ciampa,* 793 F.2d 19 (1st Cir. 1986) (instructions requiring jury to proceed to lesser included offense not considered "logical progression instruction").

In this case, the instructions did not mandate a "logical progression." First, the determination of whether the four men were the robbers was a function of the *jury's* assessment of the evidence. Second, the "progression" to the conclusion that Kavanagh and Maguire were among the

four, as the count emphasized, required an independent evaluation of Officer Murphy's testimony. Finally, the judge's instructions concluded by re-emphasizing that the jury was not bound by his opinions:

My comments are for purposes of illustration, only. You are to draw no inferences from what I have said about what my views are about the facts. That is none of my business. You are the sole judges of the facts. That is your exclusive task.

Taken as a whole, the district court's instructions were permissible analysis and appropriate illustration of the evidence. We conclude that the instructions neither distorted the evidence nor usurped the jury's function by imposing on it factual conclusions of the court.

The verdicts of guilty are affirmed.