UNITED STATES of America, Plaintiff,

v.

Miguel A. GOMEZ BENABE, Defendant.

Crim. No. 91–276 (JAF).

United States District Court,
D. Puerto Rico.

Dec. 2, 1991.

Warren Vázquez, Charles E. Fitzwilliam, Acting U.S. Atty., for plaintiff.

Edgar R. Vega, for defendant.

## OPINION AND ORDER

FUSTE, District Judge.

On October 17, 1991, defendant Miguel A. Gómez Benabe was convicted as a principal and an aider and abetter [1] in the willful, knowing, and unlawful possession with intent to distribute of a controlled substance, 21 U.S.C. § 841(a)(1), and with the importation of a controlled substance into the customs territory of the United States from a place outside thereof, 21 U.S.C. § 952(a). Defendant, both at the end of the presentation of the government's evidence and again after the jury reached its verdict, moved for a judgment of acquittal pursuant to Fed.R.Crim.P. 29(c) [2] arguing that evidence of the pretrial photographic identifications should have been suppressed at trial since they were either obtained as the fruit of an illegal arrest or were so suggestive so as to violate defendant's due process right. The government opposes this motion arguing that the arrest was indeed based on probable cause and that the identifications were not impermissibly suggestive and were, therefore, properly admitted in evidence.

After a careful review of the record, we find that, because of defendant's failure to comply with Fed.R.Crim.P. 12(b), (c), and (f),[3] he waived his right to exclude the identification evidence as the fruit of an illegal arrest. Further, we rule that the pretrial identification procedures did not violate defendant's due process right. Because the evidence presented to the jury

---

1. A second defendant, José Enrique González Florido, pled guilty to the first count of the same indictment.

2. Rule 29(c) provides, in its pertinent part:

 (c) **Motion After Discharge of Jury.** If the jury returns a verdict of guilty or is discharged without having returned a verdict, a motion for judgment of acquittal may be made or renewed within 7 days after the jury is discharged or within such further time as the court may fix during the 7-day period. If a verdict of guilty is returned the court may on such motion set aside the verdict and enter judgment of acquittal.

3. Rule 12 states, in its pertinent part:

 (b) **Pretrial Motions.** Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion. Motions may be written or oral at the discretion of the judge. The following *must* be raised prior to trial:

 . . . .

 (3) Motions to suppress evidence; or

 (4) Requests for discovery under Rule 16. . . .

 (c) **Motion Date.** Unless otherwise provided by local rule, the court may, at the time of the arraignment or as soon thereafter as practicable, set a time for the making of pretrial motions or requests and, if required, a later date of hearing.

 . . . .

 (f) **Effect of Failure to Raise Defenses or Objections.** Failure by a party to raise defenses or objections or to make requests which must be made prior to trial, at the time set by the court pursuant to subdivision (c), or prior to any extension thereof made by the court, shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver.

 Fed.R.Crim.P. 12(b), (c), (f).

was more than sufficient to return a guilty verdict, we deny defendant's Rule 29 motion for judgment of acquittal.

## I.

### Facts and Prior Proceedings

The circumstances which led to the defendant's conviction arose from an on-going investigation initiated by the United States Customs Service ("Customs") into narcotics smuggling at the municipal pier in Ponce. In aid of this investigation, Customs enforcement personnel have made use of confidential informants who provide information as to the specifics of the narcotics transactions in exchange for payment by the government. In this case, the confidential informant's identification of defendant and his testimony at trial were crucial to both defendant's arrest and his conviction.

On July 21, 1991, the vessel Eurocolombia arrived at the municipal pier around 7:00 P.M.[4] Testimony from Customs Agent José Ruiz revealed that this particular vessel had been under investigation by Customs for eight to nine months. It had been prearranged that the confidential informant, a seaman aboard the Eurocolombia, would wear a hat to signal Customs personnel that contraband was on board the ship. (Tr. 173). After seeing the confidential informant wearing a hat, along with the normal boarding for Customs inspection, agent Ruiz boarded the vessel and made contact with the confidential informant.

The confidential informant led Ruiz to a locker where a Colombian national known as Alfonso had placed five one-kilo packages of cocaine while the vessel was in port in Colombia.[5] Along with placing the cocaine aboard the ship, Alfonso also gave the confidential informant two telephone numbers to call when he arrived in Ponce. The confidential informant was to ask for "Pepe" or "José" in order to arrange for the exchange of the drugs. Although initially deterred from calling the Puerto Rico contacts by an out-of-order dockside phone, the confidential informant finally made contact around 11:00 P.M. aided by a cellular phone provided by agent Ruiz. The time and place for the exchange were tentatively set. At that point the confidential informant relayed the information to agent Ruiz who then arranged for surveillance units to be in place both inside the pier and in the adjacent area to arrest the parties who showed up to complete the transaction. After a couple of more calls back and forth, the confidential informant received a call that José and a friend were at the Ponce pier gate in a red Toyota four-by-four vehicle and that the confidential informant should come to make the exchange.

In succession, the confidential informant taped the five kilos of cocaine to his body, disembarked from the vessel, left the pier area, and walked out to Comercio Avenue where he made contact with the vehicle. He testified that upon entering the jeep, he found José in the driver's seat and defendant in the front passenger seat. The vehicle moved to a nearby cash-and-carry where they exchanged $10,000 for the cocaine. After the exchange, which took a few minutes, the confidential informant exited the vehicle and walked behind it noting its license plate number, after which he returned to the ship. At this point, the confidential informant had had no contact with any law enforcement personnel and gave no description of the occupants of the vehicle to Customs personnel.

█ It was after these events that the enforcement operation went awry. The plan had been to stop the vehicle once the transaction had been completed. Instead of being intercepted, the red vehicle sped away from the area. Agent Ruiz then began to follow in what turned out to be a high-speed chase through Ponce with both vehicles ending up in the town of Santa

---

4. Evidence was presented at trial that this vessel arrives in Ponce just about every ten days. (Tr. 128).

5. Although there were several hours from the time that Ruiz first inspected the packages until the time of delivery, he made no effort to mark, photograph or in any other way preserve the evidence for precise identification at trial.

Isabel. Although Ruiz testified that the Customs agents never lost sight of the vehicle, upon arriving at the entrance to the town, they came upon the red vehicle which had skidded into a pole and had subsequently crashed into the wall of a funeral home. The officials came upon the vehicle at around 4:30 A.M. Inside the vehicle the agents found $15.90 in cash, two cellular phones, a revolver holster, and one kilo package which field-tested positive for cocaine. No occupants were found in the vehicle.[6]

At that point, Puerto Rico police officer Juan de León, on the scene investigating the car accident, received a radio call from the local police station with information that a person was acting strangely at a local bar-restaurant located about half a kilometer from where the accident occurred. Agent Ruiz and officer de León responded and arrived at the bar. The bar owner informed them that the person was very nervous and shaking and was a stranger in the area.[7] Defendant did not appear injured nor was there any evidence linking him to the accident vehicle. The officers still had no description of the suspects inside the vehicle. Officer de León testified that, based on the suspect's nerv-

ousness and the fact that he was a stranger, defendant was placed under arrest and taken first to the scene of the accident and then removed to the Customs enforcement office in Ponce. (Tr. 144–46, 246, 252). The arrest occurred around 5:15 A.M.

Thereafter, the confidential informant received two visits from enforcement officials. First, Customs official Manuel Zurita testified that after the arrest he received orders from his supervisor to go to the Eurocolombia and elicit from the confidential informant a description of the two occupants of the vehicle. (Tr. 265–66). The confidential informant testified that Zurita's visit took place between 6:00 and 6:30 A.M.[8] (Tr. 309). Subsequently, agent Ruiz went to the Eurocolombia to show the confidential informant two photographs taken of the defendant at the Customs enforcement office. The confidential informant identified defendant in the following manner. Ruiz showed him the two photographs and asked if the person in the photo was the driver. The confidential informant responded by stating that the person in the photo was the passenger and not the driver. (Tr. 310). Shortly thereafter, around 7:30 A.M., the vessel departed the port of

---

**6.** Both agent Ruiz and Carlos Ruiz, another Customs agent, testified that, upon arriving at the scene, concerned citizens had said that the two occupants had *fled* the vehicle and were heading to town. (Tr. 110–11, 137–38). Both times defense counsel objected to this characterization on hearsay grounds. While at the moments the statements were made, the court declined to grant the objection, now in the reflective ambiance of chambers, we think that the testimony as to defendants' whereabouts fits the excited utterance exception to the hearsay rule, Fed. R.Evid. 803(2) in that: (1) the accident witnessed by the declarants would qualify as a startling event; (2) there was a close temporal relationship between the arrival of the law enforcement officials and the accident; and (3) the statement related to the startling event. *United States v. Bailey,* 834 F.2d 218, 227–28 (1st Cir.1987) (citing elements). *See United States v. Vázquez,* 857 F.2d 857, 864–65 (1st Cir.1988); *Puleio v. Vose,* 830 F.2d 1197, 1203–07 (1st Cir. 1987) (excited utterance hearsay exception discussed in state habeas corpus review context), *cert. denied,* 485 U.S. 990, 108 S.Ct. 1297, 99 L.Ed.2d 506 (1988). While we opine that the government might have been able to use testimony from witnesses to the accident to help

establish probable cause to arrest defendant, *see infra.,* we cannot say that any references to "fleeing" persons represents inadmissible hearsay to which the jury should not have been exposed.

**7.** During Agent José Ruiz' testimony, the government sought to introduce evidence of a statement made by defendant that he was the nephew of the bar owner, which relationship the bar owner denied. (Tr. 143–44). At that moment, the evidence was not presented to the jury. However, during officer de León's testimony, these statements were again made with no contemporaneous objection made by defense counsel. (Tr. 245–46).

**8.** While defendant sought to impeach Zurita's testimony pointing to his own investigation report which gave 10:00 A.M. as the hour when he went to the boat to get the suspects' descriptions from the confidential informant, which would have been impossible since the vessel had sailed hours earlier with the confidential informant aboard, we find credible the agent's testimony that the error in time was nothing more than an honest mistake in noting the time in the report.

Ponce with the confidential informant aboard.

Around 9:00 A.M. of the same day, Police Officer de León testified that he received a phone call from a resident of the Paso Seco neighborhood stating that a stranger was in the area who appeared nervous, was wearing torn clothes, and had a wound on his forehead. (Tr. 247–48). The officer went there, arrested González Florido and contacted agent Ruiz. There was no testimony or other evidence presented to the effect that officer de León had received a description of González Florido prior to his arrest.[9]

Officer de León further testified that a week later, on July 29, 1990, the remaining four kilos of cocaine were discovered in the backyard of a home that was located about twenty-five meters from where the accident had occurred. (Tr. 248–49).

As stated earlier, the confidential informant had left Puerto Rico with the vessel around 7:30 A.M. on the morning of July 22, 1991. However, ten days later, on August 2, 1991, the Eurocolombia returned to the port at Ponce. This time, agent Ruiz met with the confidential informant and showed him two series of photographs, one containing defendant and the other containing González Florido. The confidential informant identified both defendants as the occupants of the vehicle.

■ Prior to trial, defendant filed a motion for discovery pursuant to Fed. R.Crim.P. 16. In the motion defendant requested: (1) names and addresses of all informants which the government was going to use at trial; (2) materials relating to offers of immunity or leniency offered by the government to potential witnesses which defendant described as "Brady" material, see Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and

(3) names of the enforcement agents that participated in the surveillance at the Ponce pier. (Docket Document No. 10). No pretrial request was made to discover documents or photos within the possession of the government pursuant to Fed. R.Crim.P. 16(a)(1)(C).[10] Nor did defendant move to suppress this evidence as required pursuant to Fed.R.Crim.P. 12(b)(3).

At trial, the jury heard the testimony of government enforcement personnel and the confidential informant. As part of the latter's testimony, the confidential informant made an in-court identification of defendant. (Tr. 305). During cross-examination, defendant did not seek to seriously challenge this in-court identification.

Twice during the government's case-in-chief the prosecutor sought to admit the two photospreads into evidence. (Tr. 159–61, 320). Both times the court deferred ruling on their admissibility until after defendant had the opportunity to cross-examine the witnesses. At the end of the presentation of the government's evidence, the Assistant United States Attorney again renewed his motion to admit the photospreads. (Tr. 350). It was at this point, for the first time, that defendant formally moved to suppress this pretrial identification evidence. After hearing the parties' arguments on the issue, the court admitted the photospreads into evidence. (Tr. 380). Defendant interposed a contemporaneous objection. The government then rested.

Immediately defendant moved for a judgment of acquittal pursuant to Fed. R.Crim.P. 29, which the court denied. (Tr. 380, 387). The defense then rested. The jury heard closing arguments and was charged by the court. They returned a verdict of guilty as to both counts of the indictment. After the jury was discharged, defendant announced in open court that a

---

9. José González Florido pled guilty before the trial commenced.

10. The government gave open-file discovery to defendant. See Order entered August 29, 1991, Docket Document No. 9. However, the parties failed to confirm in writing what was contained in the open-file discovery package. Now, the court finds itself in the typical controversy generated by such informal procedure. The defendant claims he did not see the photos before trial. The government claims they were available. In any event, we must insist that open-file discovery should always be confirmed as to content, in writing, by both parties. As a matter of fact, we will insist in future cases that this be complied with.

written Fed.R.Crim.P. 29 motion would be filed. (Tr. 467–68). It is this latter motion, along with its opposition, which is now pending before the court.

## II.

### Rule 29 Standard

In ruling on a Fed.R.Crim.P. 29(c) motion, the court "must take the evidence in the light most favorable to the government" and must deny the motion if, "taking the facts and the reasonable inferences therefrom, a rational jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Lema*, 909 F.2d 561, 569 (1st Cir.1990); *United States v. Rivera–Santiago*, 872 F.2d 1073, 1078–79 (1st Cir.) *cert. denied sub nom, Castro–Poupart v. United States*, 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 576 (1989); *United States v. Paone*, 758 F.2d 774, 775 (1st Cir.1985) (same standard applied to circumstantial evidence cases).

Here, defendant argues that if the pretrial identifications were "disregarded", there would be no independent basis for the identification of the defendant. We disagree. The record reveals that the confidential informant identified defendant as the passenger in the vehicle at three different moments: (1) within a few hours after the deal was completed; (2) ten days later by means of the photospread, and (3) while giving testimony at trial. Therefore, leaving aside for a moment the issue of waiver, in order for the court to grant a judgment of acquittal the court would first have to determine whether an illegal arrest occurred and, if so, whether the two pretrial identifications, as well as the in-court identification, were "fruits" of the illegal arrest. A second issue would be, independent of an arrest violative of the Fourth Amendment, whether the pretrial identification procedures were so suggestive so as to violate defendant's due process right and that, because of this, the in-court identification was also tainted. If, in fact, any of the *three* identifications were found admissible, the record as it stands could provide a basis for a reasonable juror to find defendant guilty beyond a reasonable

doubt. If that were the case, the issue before the court would not be one of the sufficiency of the evidence, but rather whether a jury, after excision of the inadmissible evidence, would convict based on the remaining evidence. *See Tibbs v. Florida*, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982); *United States v. Porter*, 807 F.2d 21 (1st Cir.1986), *cert. denied*, 481 U.S. 1048, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987). In other words, if the court were to find any of the identification evidence admissible, the issue would be one of determining the weight of the evidence, a task for the jury. Under such circumstances, the remedy would not be a judgment of acquittal, but rather a new trial where the jury would receive only the admissible evidence. *See Tibbs, Id.*

However, this discussion is academic since the court finds that defendant waived his right to suppress the pretrial identification evidence by failing to timely file a motion to suppress pursuant to Fed.R.Crim.P. 12 and that the pretrial and in-court identifications did not violate defendant's due process right. Given the admissible evidence that was put before the jury, there is more than sufficient evidence for a jury to convict defendant and, under the Fed.R.Crim.P. 29 standard, defendant's motion must be denied.

## III.

### Discussion

A. Waiver

■ The record is clear that, prior to trial, defendant made no Rule 16 motion requesting discovery of the pretrial identification evidence. Nor did he make a Rule 12 motion to suppress. Defendant only sought the identities of both the confidential informant and the law enforcement agents, as well as any exculpatory materials in the government's possession.

Under Fed.R.Crim.P. 12(b)(3), motions to suppress evidence *"must* be raised prior to trial" and failure to do so "shall constitute waiver thereof." Fed.R.Crim.P. 12(f) (emphasis added). A court may only grant relief from this waiver "for cause shown."

*Id.; United States v. Mendoza–Acevedo,* 950 F.2d 1, 3 (1st Cir.1991); *United States v. Leal,* 831 F.2d 7, 10–11 (1st Cir.1987); *United States v. Gómez,* 770 F.2d 251, 253–54 (1st Cir.1985); *United States v. Barletta,* 644 F.2d 50, 53–54 (1st Cir.1981); *United States v. Farnkoff,* 535 F.2d 661, 662–64 (1st Cir.1976) (affirming the denial of an untimely motion to suppress based on a prior version of Fed.R.Crim.P. 41(e)); 1 C. Wright, *Federal Practice and Procedure: Criminal 2d* § 193 (1982 and 1991 Supp.).

The Advisory Committee Notes to the 1974 Amendment to Rule 12(b) explained the requirement that motions to suppress must be timely raised.

Subdivision (b)(3) makes clear that objections to evidence on the ground that it was illegally obtained must be raised prior to trial. This is the current rule with regard to evidence obtained as a result of an illegal search. See rule 41(e); C. Wright, Federal Practice and Procedure: Criminal § 673 (1969, supp.1971). It is also the practice with regards to other forms of illegality such as the use of unconstitutional means to obtain a confession. See C. Wright, Federal Practice and Procedure: Criminal § 673 at p. 108 (1969). It seems apparent that the same principle should apply whatever the claimed basis for the application of the exclusionary rule of evidence may be. This is consistent with the court's statement in *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) [*overruled on other grounds, United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980) ];

This provision of Rule 41(e), requiring the motion to suppress to be made before trial, is a crystallization of decisions of this court requiring that procedure, and is designed **to eliminate from the trial disputes over police conduct not immediately relevant to the question of guilt.** (Emphasis added).

In *Gómez,* the First Circuit opined that: The rationale usually given for removing suppression questions from the trial itself is that "interrupt[ing] the course of the trial for such auxiliary inquiries impedes the momentum of the main proceeding and breaks the continuity of the jury's attention." *Nardone v. United States,* 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939).

770 F.2d at 251.

The case before us provides a good example of the utility of this rule. Prior to trial defendant raised no issue as to the circumstances surrounding his arrest nor did he seek discovery of the identification evidence. Defendant made no suppression motion. Until the moment that evidence was being presented at trial, the court had no idea that the pretrial identification procedures might have been the fruits of an illegal arrest and subject to the exclusionary rule or that they had been conducted in such a way as to possibly violate defendant's due process right. Here, the law enforcement personnel's conduct at the time of arrest was not relevant to the question of defendant's guilt. Having to debate these issues, either before the jury or at sidebar, would most certainly have distracted the jury. Conducting a mid-trial suppression hearing out of the jury's hearing would equally have affected the continuity of the jurors' attention.

Nor has defendant presented any legitimate explanation for his failure to timely move to suppress the evidence, a necessary condition for this court to grant relief from the waiver provision pursuant to Fed. R.Crim.P. 12(f). *See Mendoza–Acevedo,* 950 F.2d 1, 3; *see also* 1 Wright § 193 at 698 & n. 24. Defendant was represented by counsel. A pretrial motion was filed requesting discovery. Without some reason as to why a motion to suppress was not filed, this court can find no basis for not applying the waiver rule.[11]

## B. Government's Right To Appeal

There is one more reason why granting relief from the waiver provision would be

---

**11.** We note that the issue was considered as a potential defense by codefendant José González Florido. In his motion to continue the trial, attorney Francisco López Romo advised the court of his intention to look into the issue of defendant's identification. *See* motion and order filed October 10, 1991, Docket Document Nos. 14 and 15.

inappropriate in this case. Fed.R.Crim.P. 12(e) provides that pretrial motions are decided before trial "unless the court, for good cause, orders that [they] be deferred for determination at the trial of the general issue or until after verdict." However, the court has no discretion to defer the determination "if a party's right to appeal is adversely affected." *Id.* Under 18 U.S.C. § 3731, the government can appeal, *inter alia,* a district court's order suppressing or excluding evidence. *See United States v. Kane,* 646 F.2d 4 (1st Cir.1981); *United States v. Barletta,* 644 F.2d 50 (1st Cir. 1981).

In *Barletta,* the First Circuit discussed the circumstances under which a district court can defer a Rule 12 determination until trial without adversely affecting the government's right to appeal under 18 U.S.C. § 3731. In reviewing the legislative history of section 3731, the court noted that "motions to suppress, based on the exclusionary rule, are at the heart of the legislative purpose in providing government appeal rights." 644 F.2d at 54. The court further opined:

> Indeed, § 3731 as originally enacted limited the government's right to appeal to orders "suppressing evidence", a clear parallel to the scope of Rule 12(b)(3).

Were a defendant able to delay such a motion until trial, he could prevent the government from appealing, thus frustrating the central purpose of § 3731. It is for this reason that motions to suppress—motions based on the exclusionary rule alone—must be made by a defendant prior to trial or not at all, and for this reason as well that a district court ordinarily may not defer a ruling on a defendant's motion to suppress. We agree with the district court that such rulings and the government's ability to appeal them are at the core of 12(e).

*Barletta,* 644 F.2d at 54–55.

Here, the issue as to whether the government's identification evidence was the "fruit" of an illegal arrest is a very close question. Had we decided the issue during trial or should we now rule to suppress in the context of a Rule 29 motion, the government would not be able to appeal the ruling since jeopardy would have already attached. 18 U.S.C. § 3731. Consequently, to the extent that defendant seeks to exclude the photo identifications as fruits of an illegal arrest, his failure to file a timely motion to suppress forecloses raising that issue during trial or after verdict.[12]

---

**12.** Because of our ruling, we do not have to decide the issue as to whether defendant's arrest violated the Fourth Amendment. However, examining the government's position, argued both at trial and in its Rule 29 opposition, that the arrest was lawful, we must comment briefly and state our concern with the government's position and its erroneous statement of fourth amendment jurisprudence. *See* Docket Document No. 35, Government's Opposition, Section A, *The Detention Issue.*

The facts on the record simply do not provide probable cause to justify the warrantless arrest. When agent Ruiz and officer de León arrested defendant, they did so based on the fact that he: (1) was a stranger; (2) was nervous; (3) had neither identification nor money, and (4) gave evasive answers. The officers had not seen the defendant nor were they armed with a description from the informant. They did not see defendant alight from the vehicle nor was there any evidence that the eye witnesses to the accident (described by the witnesses as "concerned citizens") gave a description of the occupants to the vehicle which matched the person in the bar. The person confronted in the bar did not appear injured and carried nothing on his per-

son that might connect him to the vehicle. Also, the town was celebrating "fiestas patronales" (the feast of a town's patron saint) and, therefore, the presence of a stranger, even at that late hour, would not have been all that unusual. There is no evidence in the record that the bar owner's call to the police had any relationship to the car accident, but rather was simply alerting the local authorities of a person acting strangely within his establishment. Given all of these facts, it is difficult to find that the officers had probable cause at the time of the arrest.

The government argues that this arrest occurred within the permissible boundaries for a warrantless arrest. A recent First Circuit case restates the proper test for the existence of probable cause as being "whether, at the moment the arrest was made, ... the facts and circumstances within [the officers'] knowledge and of which they had reasonable trustworthy information were sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense." *United States v. Uricoechea–Casallas,* 946 F.2d 162, 164 (1st Cir.1991) (citing *United States v. Figueroa,* 818 F.2d 1020, 1023 (1st Cir.1987) (quoting *Beck*

The court in *Barletta* went on to examine whether other evidentiary matters not implicating the exclusionary rule required decision prior to trial. *Id.* at 55–59. However, the context in which the court framed this discussion had to do with the *government* seeking pretrial rulings on the admissibility of evidence. As to these evidentiary matters, the circuit court was clear that "[a] defendant has no obligation to move for a pretrial ruling on such issues and does not waive them by waiting until trial." *Id.* at 55.[13]

Therefore, we read *Barletta* as limiting defendant's waiver to challenging the identification procedures based on "fruit of the poisonous tree" grounds. Defendant did not waive his right to challenge both the initial photographic identification, as well as the subsequent photo array, on due process grounds. Accordingly, we now examine the identification evidence to deter-

mine whether admitting this evidence constituted a violation of defendant's due process right.

## C. Identification Evidence

 · The record establishes that the confidential informant first identified the defendant through the use of two photographs taken of defendant at the Customs office immediately after his arrest. It is defendant's contention that this initial identification procedure was so impermissibly suggestive that his due process rights were violated and that this initial identification affected both the subsequent photo array identification and the confidential informant's in-court identification. Defendant seeks exclusion of both the pretrial and in-court identification evidence. We disagree and find that, given the circumstances surrounding the initial identification procedures, they were not so impermissibly sug-

---

*v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964)). *See United States v. Cruz Jiménez*, 894 F.2d 1, 4–5 (1st Cir.1990); *United States v. Jorge*, 865 F.2d 6, 9 (1st Cir.) *cert. denied*, 490 U.S. 1027, 109 S.Ct. 1762, 104 L.Ed.2d 198 (1989). Here, without any description of the defendant and without any facts linking him to the vehicle, this court cannot imagine how, at the moment of the arrest, the officers' knowledge could have been sufficient to warrant belief that defendant had committed an offense. Here, numerous witnesses, "concerned citizens" as government witnesses termed them, could have been brought to trial to testify to link the occupants of the vehicle to the man in the bar. A description of the defendant could have been gotten prior to defendant's arrest or defendant could have been kept under surveillance until such a description was obtained. While the sequence of events which occurred—arrest, photographing, viewing of photo by confidential informant, formal charging—might be convenient for law enforcement personnel, they certainly do nothing to promote the Fourth Amendment goal of making "the people to be secure in their persons ...." U.S. Const. amend. IV.

In fact, the government practically concedes that they lacked probable cause at the time defendant was placed in custody, since throughout the proceedings it has asserted that while defendant was "detained" at the bar, it was not until after the confidential informant identified the defendant from the photo that he was formally "arrested". However, the record is clear that, at the moment the officers took defendant from the bar, the official authority asserted against him was such that "a reasonable person

would have believed that he was not free to leave," *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980); *Florida v. Royer*, 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983), and as such he was "seized" for Fourth Amendment purposes.

Our reason for this lengthy digression is simply to point out this court's concern for law enforcement practices which, in a very real sense, may affect citizens' constitutional rights and jeopardize what, in other respects, might be thorough and effective criminal investigations. Here, had defendant not waived his right to suppress the identification evidence, this court may well have been forced to suppress otherwise probative and admissible evidence simply because of the agents' failure to follow strict investigation techniques. *See United States v. Maldonado–Espinosa*, 767 F.Supp. 1176 (D.P.R. 1991). Confidence in law enforcement is extremely important. Superficiality in investigation and evidence-gathering for trial purposes can only bring distrust from the citizenry and the courts. These days, specially in drug enforcement, the last thing we need is for such a loss to occur.

13. As to this issue, the court in *Barletta* held:

[O]nce a district court has decided that a motion may be raised prior to trial under 12(b)—that an issue is sufficiently "capable of determination without the trial of the general issue"—it may then find no "good cause" for deferring a ruling under 12(e), since to do so would adversely affect the government's right to appeal under § 3731.

*Id.* at 59.

gestive and conducive to misidentification as to violate defendant's fourteenth amendment right. We further hold that, even if the pretrial identification procedures were found to be impermissibly suggestive, the totality of the circumstances suggests that the confidential informant's identification of defendant was reliable. We, therefore, find that the identification evidence was properly admitted.

The foundational case discussing this issue is the United States Supreme Court case, *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). In *Simmons*, the day after a robbery, five bank employees were shown snapshots obtained from a codefendant's sister and all five identified defendant as one of the robbers. At trial the government did not seek admission of the snapshots, but rather presented the in-court identification of the five witnesses under oath. In refusing to prohibit the pretrial identification procedure using photographs, either on constitutional grounds or in the exercise of its supervisory power, the Court held that:

> [C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

*Simmons*, 390 U.S. at 384, 88 S.Ct. at 971. The Court went on to find that this standard was in accord with the decision in *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967), where the Court held a "totality of the circumstances" standard must be used to determine whether the identification procedure comports with due process.[14]

Subsequent Supreme Court decisions have considered the scope of the due process protection to be afforded a defendant with respect to the admission of evidence derived from suggestive identification procedures. *See Foster v. California*, 394 U.S. 440, 442–43, 89 S.Ct. 1127, 1128, 22 L.Ed.2d 402 (1969) (due process violation, consisting in repeatedly exposing victim to suggestive identification procedures, found where only witness to the crime failed to positively identify suspect both in lineup and in one-to-one confrontation, although later identifying the suspect in second lineup and at trial); *Coleman v. Alabama*, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970) (in-court identification found admissible after a fleeting but "real good look" at defendant in the headlights of a passing car and a suggestive station house line-up); *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) (using the "totality of the circumstances" test, the Court held that a showup identification seven months after attack was reliable even though the confrontation procedure was suggestive). Finally, in *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the Supreme Court ruled that the *Neil v. Biggers* test—that due process is not violated by a suggestive and unnecessary identification procedure so long as the identification possesses sufficient aspects of reliability—was to apply to post-*Stovall* confrontations.

Based on *Simmons*, the First Circuit has enunciated a two-pronged test to determine whether identification evidence based upon impermissibly suggestive photo identifications should be excluded at trial. *United States v. Maguire*, 918 F.2d 254, 263 (1st Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1421, 113 L.Ed.2d 474 (1991).

> The first prong involves determination of whether the identification procedure was impermissibly suggestive. If it was not, the court need proceed no further in its inquiry....

> The second prong of *Simmons*, invoked only when a photospread has been deemed impermissibly suggestive, mea-

---

**14.** In *Stovall*, the police took defendant to the hospital where the victim had just received life-saving surgery in order to identify him. 388 U.S. at 295, 87 S.Ct. at 1969. At trial, the victim testified as to the hospital identification and also provided an in-court identification of defendant. The Court agreed with the Second Circuit, sitting *en banc*, that the victim "was the only person in the world who could exonerate Stovall. Her words and only her words, 'he is not the man', could have resulted in freedom for Stovall." 388 U.S. at 302, 87 S.Ct. at 1972.

sures the reliability of the identification based on the totality of the circumstances according to a five-point index delineated in *Neil v. Biggers*, 409 U.S. 188, 199–200 [93 S.Ct. 375, 382, 34 L.Ed.2d 401] (1972) (witness' opportunity to view suspect, degree of attention, accuracy of prior description, level of certainty, and time lapse between crime and identification). *Id.* at 263. *See also United States v. Bouthot*, 878 F.2d 1506, 1514 (1st Cir.1989); *United States v. Alexander*, 868 F.2d 492, 495 (1st Cir.), *cert. denied*, 493 U.S. 979, 110 S.Ct. 507, 107 L.Ed.2d 509 (1989); *Judd v. Vose*, 813 F.2d 494, 498 (1st Cir.1987) (citing *Simmons* standard for when a conviction based on an in-court eyewitness identification following a pretrial photographic identification must be set aside).

Applying this two-prong test, we find that, given the facts of this case, the photographic identification and the subsequent photo array were not impermissibly suggestive. At the time the confidential informant was shown the photos, *he* was the only one who had seen and could describe the defendant. While the transaction in the vehicle had been conducted in ·a short space of time, the confidential ·informant was in close physical proximity to both the driver and the passenger. He testified that he and the defendants passed to one another both the money and the drugs which would suggest that those in the front seat had to turn around to face the confidential informant. Prior to the photographic identification, the confidential informant had given a description matching defendant to agent Zurita. All these factors favor the inference that the confidential informant was clear in his recollection of defendant.

Also, like the hospital patient in *Stovall*, one sentence from the confidential informant—"That's not him"—could have led to defendant's release and exoneration. Especially here, where the confidential informant was the only person who could link defendant to the vehicle, the need for a rapid identification is at its greatest. If the agents had mistakenly identified defendant, the perpetrator would have still been on the loose and law enforcement person-

nel would have had to step up their search in Santa Isabel. Given both the very short period of time before the vessel sailed and the undercover nature of the confidential informant's role in the ongoing Customs investigation, the identification method used—albeit less than perfect—represented just about the only viable alternative left open to the law enforcement officials. Anyone arrested after the boat sailed would have been held based solely on the confidential informant's description and *could* not have been identified for ten days until the confidential informant returned to Ponce. We think that, in the exigent circumstances surrounding this investigation, the agents acted within constitutional bounds with respect to the photographic identification procedure used that morning at the boat.

Nor do we think that Ruiz' encounter with the confidential informant when the photographs were displayed created an impermissibly suggestive identification. We think that Ruiz' question—whether the photo identified the driver—followed by the confidential informant's response—"No, it is the passenger"—taken together, did not serve to "prompt" the confidential informant. The evidence established that Ruiz did *not* have a description of the defendant when he approached the confidential informant with the photographs. It would be disingenuous to say that while Ruiz himself did *not* have descriptions of the occupants of the vehicle, he was still attempting to influence the confidential informant's identification.

Finally, as the court in *Simmons* opined, "[t]he danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error." *Simmons*, 390 U.S. at 384, 88 S.Ct. at 971. Here, defendant had the opportunity to and did, in fact, conduct such a cross-examination. (Tr. 344–45). Under these facts, we do not find that the procedure used gave rise to a "very substantial likelihood of irreparable misidentification."

*Simmons,* 390 U.S. at 384, 88 S.Ct. at 971.[15]

While we rule based on the first prong of the *Simmons* test, we simply note here that even if we were to find the first photo identification impermissibly suggestive (which we do not), applying the five-part test in *Biggers,* we would still find the identification reliable. As we said above, the confidential informant was in close proximity to the defendants in the vehicle and so had adequate opportunity to view them. The confidential informant gave his full attention to the occupants of the vehicle as he described in detail at trial what had transpired in the vehicle. Also, as a confidential informant, he was aware that he would probably be required to describe the vehicle's occupants and to possibly give testimony at trial. As to the third element, the accuracy of the description, the description given to agent Zurita, proffered before any photographs were shown, matched that of defendant. The fourth element—the witness' level of certainty—also favors a finding of reliability. It was the informant who corrected the agent's assertion that the person in the photograph was the driver and not the passenger. Finally, in no more than three hours did the confidential informant participate in the transaction, describe the occupants of the vehicle, and identify defendant as one of those occupants. Ten days later he again identified defendant and also picked the driver of the vehicle from a second photo array. Here there was no long interval between the criminal activity and the identification procedure.

As the Court in *Manson* found, so here also, given all of the circumstances surrounding the identification procedures, we rule:

Surely, we cannot say that under all the circumstances there is "a very substantial likelihood of irreparable misidentification." Short of that point, such evidence is for the jury to weigh. We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.

432 U.S. at 116, 97 S.Ct. at 2254 (citation omitted).

Because we have found that the initial photographic identification was not impermissibly suggestive, there is no bar to the submission to the jury of the subsequent photo array and the in-court identification by the confidential informant. *See Maguire,* 918 F.2d at 264–65; *United States v. Turner,* 892 F.2d 11, 14 (1st Cir.1989).[16]

We, therefore, find that, under the circumstances of this case, the pretrial identification procedures did not violate defendant's due process right and evidence of these procedures, as well as the confidential informant's in-court identification, were properly placed before the jury for it consideration. Since the evidence considered by the jury was more than sufficient to sustain defendant's conviction, we deny defendant's Fed.R.Crim.P. 29 motion.

## IV.

### Conclusion

We need go no further. We restate our rulings as follows:

1. We find that, because of defendant's failure to comply with Fed.R.Crim.P. 12(b)(c) and (f), he waived his right to exclude the identification evidence as the fruit of an illegal arrest.

2. We rule that the pretrial identification procedures did not violate defendant's due process right.

3. Based on the above rulings, we find that the evidence presented to the jury was

---

15. Again, we note that here we are not analyzing the initial photographic identification to determine whether this evidence should have been excluded because of an illegal arrest. Our decision to admit might have been different based on the application of the exclusionary rule.

16. In any case, defendant does not challenge either of the latter two identifications. Rather, he bases his Rule 29 motion on the impermissibility of the initial photographic identification.

more than sufficient to return a guilty verdict.

4. Accordingly, we DENY defendant's Rule 29 motion for judgment of acquittal.

IT IS SO ORDERED.