# UNITED STATES of America

v.

## Allen PUGH, Defendant

## No. CRIM.02–44–P–H.

United States District Court, D. Maine.

Oct. 7, 2002.

Bruce M. Merrill, Esq., Portland, for Allen Pugh, defendant.

Jonathan R. Chapman, Office of the U.S. Attorney, Portland, for U.S. Attorneys.

## ORDER AFFIRMING RECOMMENDED DECISION OF THE MAGISTRATE JUDGE

HORNBY, Chief Judge.

The United States Magistrate Judge filed with the court on August 23, 2002, with copies to counsel, his Recommended Decision on Motion to Suppress. The defendant filed his objection to the Recommended Decision on September 12, 2002. I have reviewed and considered the Recommended Decision, together with the entire record; I have made a *de novo* determination of all matters adjudicated by the Recommended Decision; and I concur with the recommendations of the United States Magistrate Judge for the reasons set forth in his Recommended Decision, and determine that no further proceeding is necessary.

It is therefore **Ordered** that the Recommended Decision of the Magistrate Judge is hereby **Adopted**. The defendant's motion to suppress is **Denied**.

## *RECOMMENDED DECISION ON MOTION TO SUPPRESS*

DAVID M. COHEN, United States Magistrate Judge.

Allen Pugh, charged with possession of, with intent to distribute, five grams or more of cocaine base in violation of 21 U.S.C. § 841(a)(1), seeks to suppress any evidence seized from the trunk of the car that he was driving at the time of the traffic stop on February 13, 2002 that gave rise to the pending charge. Indictment (Docket No. 1); Memorandum of Law in Support of Defendant Allen Pugh's Omnibus Pre-Trial Motions ("Motion") (included in Docket No. 8) at 1–5.[1] An evidentiary hearing was held before me on August 19, 2002 at which the defendant appeared with counsel. Oral argument immediately followed the hearing. Based on the evidence adduced at the hearing, I recommend that the following findings of fact be adopted and that the motion to suppress be denied.

### I. Proposed Findings of Fact

At approximately 8:15 p.m. on February 13, 2002 Officer Scott Corbett of the South Portland Police Department ("SPPD") was parked in his cruiser next to the southbound lanes on Veterans' Memorial Bridge, which runs between Portland and

---

**1.** The defendant's notice of the motion states that he seeks an order "[s]uppressing all evidence seized from the searches of the rental vehicle in this matter," Notice of Defendant Allen Pugh's Omnibus Motions (Docket No. 8) at 1, and his memorandum of law initially states his argument as "the evidence seized from the rental car should be suppressed," Motion at Table of Contents & 1, but his argument, both in the memorandum and at the hearing, addressed only evidence found in the trunk of the car. I will accordingly address only that argument; no showing has been made that would justify suppression of evidence found elsewhere in the car.

South Portland, Maine, watching for a red pickup truck and using his radar unit to monitor traffic coming out of Portland. The driver of the pickup truck was thought to be Steven Goodine. The bridge has two lanes of southbound traffic and the speed limit, posted at the start of the bridge in Portland, is 45 miles per hour. Officer Corbett's cruiser was parked two to three hundred yards into South Portland.

Officer Corbett had tested the radar unit when he began his shift at 5:30 p.m. that day, using two tuning forks designed to register at speeds of 33 and 77 miles per hour. He also pushed the button on the unit that caused it to run a self-diagnostic procedure. The unit was in proper working order. In his four years with the SPPD Officer Corbett has run checks on radar units almost every day. The tuning forks used with the radar unit in Officer Corbett's cruiser, identified as Car 7 by the SPPD, on the night of February 13, 2002 had been shipped to the SPPD on October 31, 2001. Government Exhibit ("Gov.Exh.") 9. They had been calibrated on January 12, 2001 with an "expiration date" of January 12, 2002 and certified as accurate on October 31, 2001. *Id.* They were again tested and certified as accurate on February 19, 2002, with that certification to expire on February 19, 2003. Defendant's Exhibits ("Def.Exhs.") 6–B & 6–C.

Thomas Corbett of South Portland (not related to Officer Scott Corbett) rented a silver 2002 Pontiac Bonneville from Alamo on February 12, 2002 at 10:39 p.m. Gov. Exh. 8A; Def. Exh. 4. While parked in the breakdown lane on the bridge on the night of February 13, 2002, Officer Corbett heard an audible signal from his radar unit, saw a vehicle in his rear view mirror, noted that the radar unit showed a speed of 67 miles per hour and 65 miles per hour when he locked it in, and visually observed the vehicle pass him at a speed in excess of 45 miles per hour. The position of the cruiser and the grade and turn in the road did not interfere with the ability of the radar unit to generate a reading on the speed of the vehicle. This vehicle, the only southbound vehicle visible to Officer Corbett at the time, eventually was identified as the vehicle rented the previous night by Thomas Corbett. The brake lights went on as the vehicle passed Officer Corbett, then turned onto a single-lane off ramp.

Officer Corbett pulled out behind the car and followed it to another ramp where there were two lanes. At that point he activated his lights, which also started a video camera that taped the following events through the windshield of the cruiser. The car pulled over; Officer Corbett called in the fact that he had made a traffic stop and the car's registration and then went to the driver's window. The defendant was driving the car; Diane Lewis was in the front passenger seat and a man was in the back seat. Officer Corbett asked the driver for his license and registration; the driver gave him a Maine identification card and the rental agreement for the car. He told Officer Corbett that someone named Tom, whose last name he did not know, had rented the car. He also explained that he had paid $400 in fines recently to take care of the suspension of his driver's license. Diane Lewis identified herself; the male passenger said that his name was Robert Dunham, but he had no identification with him.

Officer Corbett returned to his cruiser and ran the three names on his laptop computer to check on the status of their drivers' licenses. He learned that the defendant's license was suspended and that he was considered a habitual offender under Maine law. Diane Lewis had no violations on her driving record. There was no record for a Robert Dunham. (The male passenger later acknowledged himself to be Steven Goodine.) Officer Corbett then

called Officer Matthew Cyr, whom he knew to be on patrol in an adjacent area, to serve as backup while he arrested the defendant. After Cyr arrived, Officer Corbett returned to the Pontiac and asked the defendant to step to the rear of the car. He asked the defendant for any paperwork that would show that he had paid the fines; none was produced. He asked the defendant if he were on probation. He told the defendant that he would have let the defendant go with a summons for the speeding violation if the defendant had produced evidence to support his assertion that he had paid the fines and that his driver's license was accordingly no longer under suspension.

Officer Corbett placed the defendant under arrest without incident and placed him in the back seat of his cruiser. Officer Corbett was suspicious at this time about what might be in the car because it was not occupied by the person who had rented it, the driver could not give the full name or address of the renter and the male passenger had not provided any identification. Officer Corbett read the defendant his *Miranda* rights. After the defendant responded appropriately and indicated that he was willing to answer questions, Officer Corbett began to question him.

After arriving at the scene, where he had parked his cruiser behind Officer Corbett's cruiser, Cyr was told by Officer Corbett that the driver of the Pontiac had a suspended license and habitual offender status and that Officer Corbett was going to arrest the driver. After Cyr watched Officer Corbett put the defendant under arrest at the rear of the Pontiac, he asked the passengers in the Pontiac to step out so that he could search the interior. This was standard practice; at the time he intended to search only the passenger compartment. After the passengers got out, Cyr found what appeared to be a marijuana seed on the driver's seat. He smelled an odor of liquor inside the car. There were two cups in the cupholders between the seats in the front of the car; both contained liquid that smelled like liquor. Under one of the cups Cyr found a marijuana roach. He found another marijuana roach in the car's ashtray. He is not sure how much further searching of the interior he conducted, if any.

After finding the second roach, Cyr decided to expand his search to the trunk of the car. He believed that there could be more marijuana or alcohol somewhere in the car, which would have been evidence helpful to his investigation. He opened the trunk and saw nothing initially. He then lifted the covers over the spare tire and saw a plastic bag in the spare tire wheel well. He could not see inside the bag so he tried to pull it out. The bag got stuck so he used his hand to manipulate the contents. He then saw several smaller packets inside the bag, which, based on his experience, appeared to him to contain crack cocaine.

Not wanting to alert the passengers to his discovery, Cyr walked over to Officer Corbett and asked him to come to the trunk of the Pontiac. Officer Corbett closed the door of his cruiser and walked with Cyr, who was reaching for his handcuffs, toward the Pontiac. At that point Goodine ran around the front of the Pontiac, which had been left with the engine running, and jumped into the driver's seat. Both officers reached in through the driver's window in an attempt to keep Goodine from driving away. Officer Corbett put his upper body through the window and tried to reach the gear shift or the ignition key. Cyr grabbed Goodine. Goodine put the car into gear and started to drive away. Cyr let go and yelled to Officer Corbett to jump out. Officer Corbett eventually managed to push himself out of the moving car and fell to the pavement on his left side. Goodine accelerated toward

Main Street in South Portland. After checking Officer Corbett, Cyr got into his cruiser and set off after Goodine. The Pontiac was already on Main Street and Cyr lost sight of it. He started searching the area for the car.

After Cyr left, Officer Corbett patted down Lewis and put her into the back seat of his cruiser with the defendant.

Later that night Cyr was sent to Thomas Corbett's residence with Officer Barlow. Officers Hare and Sutton stayed outside the house while Cyr and Barlow went inside. Thomas Corbett was uncooperative at first, but after Barlow emphasized that an officer had been injured in an incident involving the Pontiac, Thomas Corbett told the officers that Goodine had been staying with him for the past ten days and that he had rented the car for Goodine. He told them that his girlfriend had gone to pick up Goodine on Bowdoin Street. Officers Hare and Sutton found he Pontiac in the same neighborhood as Bowdoin Street, parked in a lot at 58 Pleasant Street.

Thomas Corbett accompanied Cyr and Barlow to the South Portland police station. At the police station, he consented to a search of the car in writing. Gov. Exh. 10. Officers Hare and Sutton followed the tow truck that brought the car to the police station. Thomas Corbett was present while Hare searched the car. Hare began his search with the trunk. He found a large bag in the spare tire wheel well. Gov. Exh. 13. He also searched the passenger compartment, where he found, *inter alia,* one or two cups smelling of intoxicants, which he did not save, and one marijuana roach which he placed in an envelope. Gov. Exh. 14.

The SPPD has a written policy for the towing and inventory search of vehicles. Gov. Exh. 15. If a car had sped off from the scene of a traffic stop, it would have been subjected to an inventory search when it was later recovered.

## II. Discussion

The defendant contends that Cyr did not have probable cause to search the trunk of the car and that his search constituted a constitutional violation that irrevocably tainted any subsequent consent or inventory search. Motion at 2–5. The government responds that the presence of the marijuana seed and roaches and the open containers of alcohol allowed Cyr reasonably to infer that additional amounts of those substances were present somewhere else in the car. Government's Consolidated Objection to Defendant's Pre–Trial Motions, etc. ("Response") (Docket No. 11) at 3–4. It argues that Cyr's observation of those items "gave rise to a fair probability that contraband or evidence of a crime would be found in the car." *Id.* at 4, citing *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

When officers have probable cause to stop a car and arrest one or more of its occupants, as was the case here, they may also search and seize the arrested person and the contents of the passenger compartment of the car. *United States v. Maguire,* 918 F.2d 254, 259 (1st Cir.1990). The right to search and seize beyond the passenger compartment depends on the reasonable cause the seizing officer has for the belief that there is contraband present elsewhere in the car. *Id.* at 260; *see also Chambers v. Maroney,* 399 U.S. 42, 49, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) (right to search and seize depends on reasonable cause officer has for belief that contents of car "offend against the law"). A warrantless search of an entire vehicle is sanctioned when probable cause exists to search the entire vehicle. *United States v. Ross,* 456 U.S. 798, 817, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). "The scope of the search is defined by the object of the search and the places in which there is probable cause to believe that it may be

found." *United States v. Santana*, 895 F.2d 850, 852 (1st Cir.1990).

Counsel for the defendant argued at the hearing that more marijuana or alcohol in the trunk of the car would not necessarily be evidence of a crime, because possession of small amounts of marijuana and the presence of open containers of alcohol in the passenger compartment of a car are only civil violations under Maine law. 22 M.R.S.A. § 2383(1); 29–A M.R.S.A. § 2112–A. No evidence was presented to suggest that the defendant was operating the car under the influence of alcohol or drugs. However, the case law requires only that there exist either a fair probability that evidence of a crime or contraband will be found. Contraband includes "unlawful drugs." *Illinois v. McArthur*, 531 U.S. 326, 331–32, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001). Even in amounts within the Maine statutory limit for a civil violation, marijuana is an unlawful drug. Under Maine law, marijuana, even in an amount that would only give rise to a civil violation, can be the legitimate object of a search warrant and may be seized and confiscated if found. *State v. Barclay*, 398 A.2d 794, 797 (Me.1979). Accordingly, the only question here is whether the marijuana seed and two marijuana roaches—or the cups containing alcohol—provided sufficient cause to justify the search of the trunk.

In *United States v. Turner*, 119 F.3d 18 (D.C.Cir.1997), an officer who had stopped a car because it did not have a front license plate smelled burnt marijuana emanating from the passenger compartment, saw torn pieces of cigar tobacco in the driver's lap and on the seat and floor around him, and also saw a plastic bag of what he believed to be marijuana behind the driver's seat. *Id.* at 18–19. The court held that these observations provided probable cause to search every part of the vehicle, including the trunk. *Id.* at 23. In

*United States v. Parker*, 72 F.3d 1444 (10th Cir.1995), an officer who stopped a car that was being driven erratically smelled burnt marijuana in the car and found a rolled up dollar bill with a white powder residue and a marijuana roach on the driver's person. *Id.* at 1447. The court held that the officer had probable cause to search the trunk of the car. *Id.* at 1450. In *United States v. Orozco*, 715 F.2d 158 (5th Cir.1983), an officer who stopped a car for speeding saw a baggie of marijuana in the open glove compartment of the car, found unspecified "drug paraphernalia" in the glove compartment and determined that the license plate on the car did not match its registration, *id.* at 159–60. The court held that these circumstances provided sufficient probable cause to search the trunk. *Id.* at 160.

Counsel for the defendant argued at the hearing that *United States v. Wald*, 216 F.3d 1222 (10th Cir.2000), is "very similar on its facts" to the instant case and should be followed by this court. In that case, the Tenth Circuit held that an officer lacked probable cause to search the trunk of a car when the only evidence on which he could rely in determining whether to do so was the odor of burnt methamphetamine emanating from the vehicle. *Id.* at 1226–29. The court distinguished these circumstances from those in which drug paraphernalia were also found in the passenger compartment or in which an odor of raw methamphetamine was detected. *Id.* at 1226–28. Counsel for the defendant contended that the holding of *Wald* is thus that only evidence consistent with something other than personal use of marijuana will provide sufficient cause to justify the search of a car's trunk, based on the Tenth Circuit's observation that the odor of burnt methamphetamine does not provide probable cause to search a trunk "because it is unreasonable to think someone smoked drugs in the trunk of a car." *Id.* at 1228. That observation was based on citations to

prior Tenth Circuit case law, not including *Parker.*

The court's conclusion in *Wald* is difficult to reconcile with its holding in *Parker.* I do not find the court's reasoning in *Wald* persuasive. Under *Maguire,* which is binding precedent in this court, and the propositions for which case law from other circuits is cited in that opinion, 918 F.2d at 260, I conclude that there was probable cause to search the trunk of the defendant's car in this case based on the presence of the marijuana and the surrounding circumstances. Thus, there was no constitutional violation. *See generally United States v. Moxley,* 229 F.3d 1154 (table), 2000 WL 1234320 at *1–*3 (6th Cir. Aug.23, 2000); *United States v. Smith,* 166 F.3d 336 (table), 1998 WL 808402 at *1–*2 (4th Cir. Nov.23, 1998).[2] There is no need to consider whether the presence of alcohol in open containers in the passenger compartment would also provide sufficient probable cause. The motion to suppress should be denied.

This result makes it unnecessary to consider the government's alternative arguments based on Thomas Corbett's consent to search or an inventory search leading to inevitable discovery. Should there be any need in the future to reach those arguments, I observe that the defendant's argument that each such proffered validation for the search is tainted by Cyr's initial search of the trunk rests on an unsupported premise. The undisputed evidence is that the SPPD would have conducted an inventory search of the car had Goodine driven it away before Cyr opened the trunk and, as here, it was later found. Counsel for the defendant asserted that Goodine would not have done so had Cyr not opened the trunk, but that assertion is sheer speculation. In the absence of any evidence about what Goodine would have done under those circumstances, this argument cannot provide the basis for suppression of the evidence found in the trunk. *See United States v. Whitney,* 787 F.2d 457, 460 (8th Cir.1986) (suppression of evidence may not be granted based on "pure speculation"). *See generally United States v. Byrd,* 765 F.2d 1524, 1529 (11th Cir. 1985) (government not required to negate all abstract possibility of taint in showing that evidence was derived from independent source).

### III. Conclusion

For the foregoing reasons, I recommend that the defendant's motion to suppress evidence be **DENIED.**

#### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

August 23, 2002.

---

**2.** While these decisions are unreported and accordingly have no precedential value, I find the facts in each case to be sufficiently similar to those presented in this case to provide me with additional comfort that my conclusion and reasoning in this case are correct.