**UNITED STATES of America,**
**Plaintiff(s)**

v.

**Juan GOMEZ PIZARRO, Defendant(s).**

**Civil No. 03–325 (JAG).**

United States District Court,
D. Puerto Rico.

Feb. 7, 2005.

trial identification of the defendant and that it be denied as to the in-court identification (Docket No. 59). On October 20, 2004, the Government filed objections to the Report and Recommendation (Docket No. 62). The defendant filed his objections on December 31, 2004 (Docket No. 77). For the reasons discussed below, the Court **ADOPTS** in part and **REJECTS** in part the Magistrate–Judge's Report and Recommendation.

Edgar R. Vega–Pabon, Vega Pabon, Rodriguez Encarnacion & Lopez Covas, Rafael F. Castro–Lang, Castro & Castro Law Office, San Juan, PR, for Defendant.

Antonio R. Bazan–Gonzalez, Irene Feldman, United States Attorney's Office, Torre Chardon, Pretrial Services, U.S. Marshal, U.S. Probation, San Juan, PR, for Plaintiff.

## OPINION AND ORDER

GARCIA–GREGORY, District Judge.

On January 16, 2004, defendant moved the Court to dismiss the indictment against him arguing pre-accusation delay (Docket No. 22). On February 29, 2004, the Government opposed (Docket No. 29). On March 18, 2004, and on April 12, 2004, the defendant filed motions to suppress the pre-trial and in-court identification proceedings (Docket Nos. 34 & 42). The motions were referred to Magistrate–Judge Aida Delgado for a Report and Recommendation (Docket No. 26 & 44). On March 18, 2004, the Magistrate–Judge held a hearing (Docket Nos. 37 & 47). On October 5, 2004, the Magistrate–Judge recommended that the motion to dismiss be denied without prejudice, that the motion to suppress be granted as to the pre-

## FACTUAL BACKGROUND[1]

DEA agents conducted surveillance on December 28, 1998, after receiving a tip from a confidential source (hereafter "CS") of a venture to smuggle cocaine into Puerto Rico from the Dominican Republic. On December 28, 1998, at 7:40 AM, the agents observed a white Hispanic male, approximately 160 lbs., 5'9" tall, wearing jeans, a green shirt and blue baseball cap, exit from a red tow truck to assist in the unloading of a boat in Cataño. The driver of the tow truck was described as a white Hispanic male, 20 to 25 years old, approximately 5'6" tall, 145 pounds, wearing black pants, a white polo-shirt and a black baseball cap. Ten minutes later, at 7:50 AM, the agents observed a black young male wearing a dark green shirt and short pants exit a white Chevrolet pick-up truck parked at West Ocean Drive in Cataño, Puerto Rico. The pickup truck's license number was 614–077 and was registered to Samuel García–Marrero, Residencial Alegría Norte, Building 11, # 201, Bayamón, Puerto Rico. This last unidentified individual assisted those who were unloading a boat from a trailer into the water. Id. The white truck left the area and was followed by agents from the vicinity of Cataño to Toa Baja, Puerto Rico.

---

[1] The relevant facts are taken from the Magistrate–Judge's Report and Recommendation (Docket No. 59).

Later that morning, Agent Antonio Santos ("Agent Santos") observed a white male with black hair and a black mustache in the red truck while it was parked in Toa Baja. Also, Agent Santos saw the red tow truck with an empty trailer parked on the side of the road. Later Agent Santos observed the white pick-up truck parked behind the red tow truck. Two individuals were in the red tow truck. The red tow truck eventually traveled to Car Motor Sports and the white pick-up truck also arrived at Car Motor Sports.

On December 30, 1998, Agent Santos drove by the residence of Juana Cruz de Núñez ("Juana Cruz"), the wife of Carmelo Mercado–Ortiz, and observed the white Chevrolet pick-up truck bearing Puerto Rico license plate number 614–077. This was the same pick-up truck previously seen on December 28, 1998. On that same day, the white pick-up truck was also seen at Isla de Cabra, nearby the Cataño area. Based on entries within the report of investigations, the agents considered the individuals in the white truck were verifying whether "the boat had departed."

On December 31, 1998, five people were arrested near Aguadilla, Puerto Rico, in an ill-fated smuggling attempt to bring more than 1009 kilos of cocaine from the Dominican Republic into Puerto Rico. The boat used in the venture, registration number PR5892GG, was seized by the U.S. Customs Service. Reportedly, this is the same boat that was seen by agents conducting surveillance on December 28, 1998. The five individuals arrested were Carmelo Mercado–Ortiz ("Mercado"), Fermín Hilario–García ("Hilario"), Elvin Peralta–Ramírez ("Peralta"), Jorge Luis Ortiz–Delgado ("Ortiz") and Jose Edgardo Díaz–Medina ("Díaz"). Four of the individuals pled guilty and the remaining individual, Mercado, went trial and was found guilty. Co-defendants Díaz and Ortiz eventually decided to cooperate and provided information to the government regarding the smuggling venture of December 28, 1998.

The evidence on record reflects that Díaz, one of the individuals arrested on December 31, 1998, was interviewed following his arrest. At that time he stated that he was the owner of the boat used to transport the drugs into Puerto Rico. He stated that he had paid $20,000 for the vessel and $12,000 for both engines. He also stated that the boat was towed to the Isla Grande ramp by a red truck and indicated that the boat had departed from there on December 29, 1998. Díaz further stated that on December 29, 1998, prior to departure time, his wife had taken him from Fajardo to Isla Grande where the boat was located.

Based on information within the law enforcement agents' reports, on January 4, 1999, a confidential source (hereafter "CS") spoke to Juana Cruz. She stated to the CS that "Manolo" had taken Georgie's boat in an effort to avoid it being confiscated. The CS identified Georgie as Jorge Luis Ortiz–Delgado, one of the five individuals arrested on December 31, 1998. Juana Cruz also told the CS that "Manolo" and Díaz had invested a large amount of money in the boat seized on December 31, 1998.

On February 2, 2000, cooperating co-defendant Díaz ("CS Díaz") was interviewed by DEA agents regarding the smuggling venture which prompted his arrest on December 31, 1998. Díaz then stated that on December 28, 1998, he had been instructed to go to the Cars Motor Sport, a repair shop, and then to follow an individual driving a white Chevrolet pick-up truck. Reportedly, at the repair shop boat motors were configured to have more power and speed.

CS Díaz informed that on December 28, 1998, Ortiz was in the tow truck and that

he followed the individual driving the white pick-up truck to a location in Toa Baja. The Report of Investigation reflects that CS Díaz had identified this person as "Manolo". Once at the residence CS Díaz parked his vehicle near "Manolo's" residence. "Manolo" went inside the residence for a short time period, while CS Díaz waited in "Manolo's" pick-up truck. Shortly after, CS Díaz and "Manolo" departed the area in the white pick-up truck and proceeded to Cataño, Puerto Rico. Once there, CS Díaz met with Ortiz who was in the process of lowering the boat into the water. Reportedly, then "Manolo" left CS Díaz at the ramp telling CS Díaz that "he was in a hurry."

After the boat was loaded into the water it experienced engine problems, had to be removed from the water and it was returned to the repair shop. CS Díaz recalled that when he arrived at the repair shop, "Manolo", Cruz, Hilario, Mercado, Ortiz and the owner of the business were there. CS Díaz stayed at the repair shop while Mercado went to "Manolo's" residence to retrieve Díaz's vehicle.

CS Díaz also stated that on a date prior to the smuggling venture and while at Mercado's residence, Mercado was waiting for "Manolo" who was going to give him money to later on pay him [CS Díaz] for the boat. However, when later interviewed, CS Díaz stated that Mercado received the money from "Manolo" but clarified that Mercado did not pay him [CS Díaz] but rather kept the money to buy things needed for the trip.

Also, on the same date he was interviewed, CS Díaz took the DEA agents to the residence whom he believed belonged to "Manolo," located at D-7, 1-A Street, Villa de Levittown, Toa Baja, Puerto Rico.

The government alleges that, at the time a second and independent investigation into a drug distribution organization in the area of Bayamon was ongoing. This investigation revealed that the property CS Díaz referred to as the residence of "Manolo" appeared registered to defendant Juan Gómez and his spouse. Díaz also stated that "Manolo" is the owner of a boat accessory business in Fajardo, Puerto Rico. Díaz described "Manolo" as a white male, 5'8" tall, skinny, dark colored eyes, black hair, mustache and uses a baseball cap. This is a description similar to that made by DEA agents of the individual observed in the red pick-up truck during their December 28, 1998 surveillance. It must be noted that during the February 2, 2000 interview, Díaz did not identify "Manolo" as defendant Gómez.

On March 31, 2000, Agents Santos and Alverio met with CS Díaz. The purpose of the meeting was to show to CS Díaz a photograph obtained from the Puerto Rico Department of Transportation of Juan M. Gómez–Pizarro. Agent Santos showed CS Díaz the single photograph and it is alleged that CS Díaz positively identified defendant Gómez as "Manolo." The agent's report indicates that CS Díaz identified defendant Gómez as the individual who drove a white Chevrolet pick-up truck with Puerto Rico license plate 614–077 on December 28, 1998. The agent's report, however, does not state how the reporting agent came to this conclusion, inasmuch as during his prior and initial interview the physical description he provided of the individual seen on December 28, 1998, does not match that of defendant Gómez.

On November 8, 2001, cooperating co-defendant Ortiz ("CS Ortiz") was interviewed by U.S. Customs Service agents regarding the December 31, 1998, smuggling venture. CS Ortiz was one of the five individuals arrested on December 31,-1998. CS Ortiz admitted he first met defendant Gómez in 1995 while driving a powerboat for the 1995 Offshore Racing Tournament in Key West, Florida. Ortiz

stated that he did not see Gómez again until 1996 and this was at the boat shop in Fajardo. Regarding his 1998 visit to the Fajardo boat shop, CS Ortiz narrated that since he had been instructed to get some equipment for the boat that was to be used in the smuggling venture, he visited the El Pescador Marine Shop, located in Fajardo, Puerto Rico, a few days before departing for the smuggling venture. The government's investigation shows that the boat shop was owned by Gómez. At the boat shop CS Ortiz purchased some items and was told by an unidentified individual behind the counter that everything was paid for. Interestingly, if CS Ortiz knew Gómez since 1995–1996, he would have been able to recognize him in 1998, if he would have seen Gómez at the shop. Further, doubts arise regarding the so called positive identification of Gómez as being "Manolo," inasmuch as CS Ortiz reported to the interviewing agents that he had no knowledge that defendant Gómez was involved in the 1998 drug smuggling venture. He stated, however, that while he was held in custody at MDC–Guaynabo, his wife had received a telephone call from Gómez and that Gómez had told his wife that he knew an attorney who could help him (CS Ortiz) in his criminal case. CS Ortiz stated he was surprised by the telephone call and that he had never given Gómez his telephone number or any other information.

On November 4, 2003, DEA Task Force Agent, Pedro J. Pérez ("Agent Pérez") filed an affidavit in support of the Complaint filed in 03–440M (Docket 42, Ex. 1). In this complaint Gómez is named as the defendant. The affidavit attached to the complaint states that an investigation targeting the drug trafficking organization of defendant Gómez had been initiated during the calendar year of 2002. It further states that Gómez is believed to be responsible for the smuggling of thousands of kilogram quantities of cocaine into Puerto Rico during 1998. In the affidavit Agent Pérez goes on to narrate that the DEA and Puerto Rico Police had conducted surveillance on December 27, 1998, on numerous individuals and that on December 31, 1998, several individuals were arrested while attempting to smuggle cocaine from the Dominican Republic into Puerto Rico via a 30–foot boat.

In his written report Agent Pérez states that, according to a "CS," defendant Gómez had provided the money to purchase two boat motors for the craft used to transport the cocaine which was seized in December 1998. During a hearing held on March 18, 2004, Agent Pérez identified the CS as cooperating co-defendant Díaz. At the hearing Agent Pérez testified that he had debriefed CS Díaz. Agent Pérez further clarified that whenever within the affidavit it is stated that the information provided is based upon "his personal knowledge," it alludes to the information resulting from Díaz's debriefing.

In the affidavit prepared by Agent Pérez, it is reflected that CS Díaz identified defendant Gómez as being present at a meeting between co-defendants and that at said meeting defendant Gómez delivered the money to be used for the purchase of the boat motors. The affidavit reflects that CS Díaz had been advised that Gómez had given the money to Mercado for the purchase of two motors and that Mercado had in turn given the money to CS Díaz. According to the information in the affidavit, CS Díaz told Agent Pérez he had purchased one boat motor for $7,400 and the remainder of the money was given to another individual for purchase of the second motor. Finally, it is indicated within Agent Pérez's affidavit that CS Díaz now alleges that on the day of the smuggling venture he (Díaz) had been transported to the departure location in the Cataño Bay area by defendant Gómez.

It must be noted that the information within the affidavit of Agent Pérez, as more recently provided by CS Díaz, is inconsistent with the statement previously made by CS Díaz in two areas: the issue regarding the purchase of the boat motors and his means of transportation to the departure location. Following his arrest CS Díaz had stated that he had paid $20,000 for the vessel and $12,000 for both engines, while in Agent Pérez's affidavit it is reflected that Díaz had reported it was defendant Gómez the one who provided the money to purchase the boat motors. Also, on February 2, 2000, Díaz had stated that on the date that "Manolo" brought money to Mercado no money was given to him, while in the affidavit of Agent Pérez it is indicated that Díaz (the CS) had claimed to have been given $7,400 for the purchase of a boat motor. Additionally, Agent Pérez testified at the March 18th hearing and stated that it is known that CS Díaz actually did not see Gómez give money to anyone, but that Mercado had told CS Díaz that "Manolo" was the one who had given the money to him (i.e., Mercado). However, there is no information on whether in 1998 Mercado had identified [to Díaz] "Manolo" as Gómez–Pizarro.

With regard to the issue of who transported CS Díaz to the departure site in 1998, CS Díaz had initially stated that his wife had driven him to Isla Grande (nearby the Cataño area) on the day in question while in Agent Pérez's affidavit it is proffered that CS Díaz later on claimed to have been transported to the departure location in the Cataño Bay area by defendant Gómez. At the March evidentiary hearing Agent Pérez testified and answered that, when interviewed, CS Díaz had told him that he was taken to the location by defendant Gómez. When specifically questioned, Agent Pérez also testified and indicated that he never confronted CS Díaz with the prior summary or contents of the statements he had given at the time of arrest vis a vis the statements provided as part of his cooperation agreement.

Following the filing of the criminal complaint, defendant Gómez was arrested on November 10, 2003. A preliminary hearing was held on November 12, 2003 (Docket No. 33). Agent Pérez testified at said hearing that he had been assigned to the investigation for a little less than a year. Agent Pérez also testified that the evidence gathered identifies defendant Gómez as a facilitator of currency for the smuggling venture and that he supplied boat resources such as motors and motor parts to go along for the smuggling venture. Agent Pérez further testified that at the time of his arrest defendant Gómez was questioned and admitted to participating in the smuggling venture.

Agent Pérez indicated then that defendant Gómez was identified by the U.S. Customs Service as an additional member of the December 31, 1998, drug seizure, who at that time had not been located or identified by agents. Agent Pérez also indicated he understood that Gómez had been identified back in 1998 and that Gómez had been observed in surveillance by an agent (Alverio) and a confidential source. Agent Pérez further indicated that one of the resources used to identify Gómez was a confidential source, and that he had personally interviewed that source (later determined to be CS Díaz).

On December 16, 2003, a de novo hearing was held subsequent to Gómez's detention. Task Force Agent Gil García (hereafter "Agent García") of the DEA HIDTA group testified on said date (Docket No. 24). Through Agent Garcia's testimony it was established that along with Agent Rubin Oliveras, he had conducted an investigation relating to a drug trafficking organization. The investigation indicated

that an individual known as "Manolo" had participated in the smuggling operation of 1998 and that, subsequently through a CS, "Manolo" had been identified by the name of Juan Gómez–Pizarro. Agent García testified that DEA had identified "Manolo" during its investigation and that this had taken place prior to the time that he was assigned to the case. Agent García also testified that according to his investigation and prior to his involvement in the case, customs agents had not identified "Manolo".

Agent García testified that in 1998 they were able to identify the individual through surveillance set up by the DEA. In that surveillance agents observed a vehicle (the white pick-up truck) being driven by "Manolo." Later they were able to identify "Manolo" through a source used in the case. During the initial stages of the investigation the individual was referred to as "Manolo," but seven or eight months prior to the hearing date, that being May or June of 2003, a source identified "Manolo" as Juan Gómez–Pizarro. Agent García testified that in 1998 surveillance agents were able to get pictures of "Manolo" as well as photographs of the vehicle. The photographs were taken by the DEA and were from "Manolo" or from "Manolo's" vehicle. Agent García testified he never asked the case agent if they had the license plate of the vehicle.

Thereafter, Agent Pérez provided testimony at the March 18, 2004 evidentiary hearing (Docket No. 47). When Agent Pérez became the case agent in approximately March 2003, he researched the case file and discovered that "Manolo" had been observed during surveillance by Agents Alverio and Santos on December 28, 1998, that is, prior to the smuggling venture on December 31, 1998. Agent Pérez indicated that in 1998 DEA agents, by means of a driver's license, had positively identified Gómez as being "Manolo." Agent Pérez

testified that at the time he was assigned to the case (late 2001 or 2002) "Manolo" had already been identified using a Puerto Rico driver's license, investigative efforts by the agents, by CS Díaz and other confidential sources (reportedly CS Ortiz and a CS whose identity remains unknown). Agent Pérez was not aware of any attempt during the 1998 investigation to locate "Manolo" or have him charged.

For example, Agent Pérez testified that a white truck was identified as one used by "Manolo" during the 1998 drug venture. Agent Pérez is aware that during the investigation law enforcement agents were able to get the license plate of the white truck, but he did not have information on whether fellow agents had been able to identify "Manolo" through the license plate of the white truck. Agent Pérez further testified and indicated that he did not know in whose name the white truck was registered. The January 8, 1999 Report of Investigation states, however, that the truck was registered to a Samuel García–Marrero.

Photographs were admitted as exhibits during the hearing and shown to Agent Pérez. "Defendant's Exhibit A" consists of two photographs of a heavyset man approaching a white truck and two photographs of a white boat. These photographs were provided in discovery by the government. When questioned Agent Pérez indicated that he had no information on whether the agents had taken photographs of "Manolo's" vehicle. He indicated that there were other photographs taken during the investigation, but he did not recall if any of them depicted the white truck observed on December 28, 1998. He further indicated that the only photos he remembered depicting a white truck were the ones he was shown at the hearing and identified as "Defendant's Exhibit A." Agent Pérez could not say if the person

that the DEA observed in 1998 and identified as "Manolo" is the same heavy set person depicted in the photographs found at "Defendant's Exhibit A." When specifically questioned by defense counsel regarding the disparate physical description for both individuals (the one depicted by surveillance agents and the one depicted in the photographs), Agent Pérez indicated he believed that person in the photographs was not "Manolo." He also testified that the person in the photographs is not Gómez nor is the truck the one that belongs to or was registered to "Manolo." Agent Pérez did not know who was the individual in the photograph. Finally, and in spite of his previous testimony, after reviewing the photographs labeled as "Defendant's Exhibit A," Agent Pérez testified that these photographs were part of the photos regarding the surveillance of the 1,009 kilograms of cocaine.

Agent Pérez also testified that some other pictures had been taken during the surveillance, but that the photos were blurry. Reportedly, Agent Pérez did not take these photos to other fellow agents because an identification cannot be made from them.

"Government's Exhibit 1" consists of a photograph of the face of an individual with light brown skin, dark hair, dark eyes and a mustache. Reportedly, it is a picture of Gómez. Agent Pérez did not know if said photograph comes from the driver's license previously mentioned. Agent Pérez testified he had not seen the driver's license from which said Government Exhibit I was taken and that he did not know how the agents obtained the information to track the driver's license used for identification purposes.

Agent Pérez testified that his investigation file did not contain a photocopy of the driver's license, but assured the files did contain photos of "Manolo." He testified that the photos of "Manolo" are not the same individual as shown to him in "Defendant's Exhibit A" (the heavy set man walking towards a white truck). Agent Pérez further testified that photos contained in his file are not pictures taken during the 1998 surveillance, but photos taken thereafter which date is unknown. While these photographs were allegedly utilized in a presentation, the same were not turned over to counsel in discovery.

Agent Pérez explained that he also learned of a second investigation initiated in 2001–2003 wherein "Manolo" had been identified as related to an organization distributing cocaine in the area of Bayamón. It is alleged that it was during this second investigation that it was learned that "Manolo" was implicated in the 1,009 kilograms of cocaine seizure from December 1998.

Agent Pérez explained that he was not present during the 1998 investigation and surveillance, but that he had reviewed the investigative file, had gone through every detail and based on his corroborating efforts in identifying "Manolo" he is convinced that "Manolo" is defendant Gómez. The corroborating efforts to which Agent Pérez alludes entailed interviewing CS Díaz, a convicted codefendant, who turned into a cooperating source. Díaz identified the defendant as "Manolo," the person who in 1998 supplied the finances to the organization to purchase two Yamaha engines. Agent Pérez testified that cooperating codefendant Díaz made the identification in his and Agents Garcia's and Oliveras' presence. Agent Pérez testified that he believed that CS Díaz had made the identification by looking at the photograph marked as "Government's Exhibit 1." However, the evidence on record shows that there was no photo array, but rather one photo without displaying Gómez's name or any other identification marks. Díaz knew the man in the photo as "Manolo". It is alleged that cooperating co-de-

fendant Díaz is not the CS who was shown a photo back in 1998. Agent Pérez did not have the exact date in which such identification was done but believed it was made sometime in the summer of 2003.

## DISCUSSION

A. *Standard for Reviewing a Magistrate–Judge's Report and Recommendation*

A District Court may, on its own motion, refer a pending motion to a U.S. Magistrate–Judge for a Report and Recommendation. *See* 28 U.S.C. § 636(b)(1)(B); Fed.R.Civ.P. 72(b); Local Rule 72(a). Pursuant to Fed.R.Civ.P. 72(b) and Local Rule 72(d), the adversely affected party may contest the Magistrate–Judge's Report and Recommendation by filing written objections "[w]ithin ten days of being served" with a copy of the order. *See* 28 U.S.C. § 636(b)(1). Since defendant has filed timely objections to the Magistrate–Judge's Report and Recommendation, the Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which specific objection is made. *See United States v. Raddatz*, 447 U.S. 667, 673, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980); *Lopez v. Chater*, 8 F.Supp.2d 152, 154 (D.P.R.1998).

B. *The Magistrate–Judge's Report and Recommendation*

1. *Pre–Accusation Delay*

■ Defendant argues that the indictment should be dismissed because the Government did not arrest him until four years and ten months after the alleged offense, that is only fifty-six days before the statute of limitations ran out, and has thus impaired his ability to properly defend himself.

■ To prevail on an argument of pre-accusation delay, the defendant must first carry the "heavy burden" of proving "actual prejudice" to his rights to a fair trial because of the delay. *See United States v. Capone*, 683 F.2d 582, 589 (1st Cir.1982). "It is well established law that a defendant claiming impairment of his defense by delay must show specifically and not by mere conjecture wherein his defense has been impaired. Thus, a mere claim of general inability to reconstruct the events of the period in question is insufficient to establish the requisite prejudice for reversal on denial of due process." *United States v. Golden*, 436 F.2d 941, 943 (8th Cir.1971). Furthermore, the defendant must demonstrate that the Government acted in bad faith. *See United States v. Ciampaglia*, 628 F.2d 632, 639 (1st Cir.1980). This may be shown by proving "that the delay was an intentional device to gain tactical advantage over the accused," *United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), or that the Government acted "in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense." *United States v. Lovasco*, 431 U.S. 783, 795 n. 17, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977).

The Magistrate–Judge recommended that the motion be denied because the defendant failed to demonstrate actual prejudice to his defense or that the Government acted in bad faith. The Magistrate–Judge found, however, that a myriad of questions still abound about the Government's inability to identify and locate "Manolo". Accordingly, she recommended that the motion be denied without prejudice because only after all the testimonial evidence is presented at trial would the Court be in a better position to consider defendant's motion.

In his objections, defendant argues that he is prejudiced in that he is unable to

reconstruct events that occurred almost five years before his arrest. A general inability to reconstruct past events, however, is insufficient to prove actual prejudice. *See Golden,* 436 F.2d at 943. Defendant further objects that the delay is unjustified insofar as the Government had identified him at least three years before his arrest. Defendant nevertheless fails to demonstrate that the Government acted in bad faith in its failure to arrest him when he was first identified. Accordingly, his motion must be denied.

### 2. *Suppression of Pretrial and In–Court Identification*

Defendant seeks suppression of the pretrial identification made by CS Diaz and CS Ortiz as highly suggestive inasmuch as they were only shown one photo of the defendant. The Defendant also asks that the Court preclude any in-court identification as it would be tainted by the suggestive pretrial identifications.

The Supreme Court has "fashioned a two-pronged test for the exclusion of identifications based upon impermissibly suggestive procedures. The first prong involves determination of whether the identification procedure was impermissibly suggestive." *United States v. Maguire,* 918 F.2d 254, 263 (1st Cir.1990)(*citing Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)). "The second prong . . ., invoked only when a photospread has been deemed impermissibly suggestive, measures the reliability of the identification based on the totality of the circumstances according to a five-point index. . . ." *Id.* The factors to be considered are "[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation." *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

■ The Magistrate–Judge, looking at the totality of the circumstances surrounding the identification procedures, found that the procedures whereby CS Ortiz and CS Diaz identified the defendant as "Manolo" were impermissibly suggestive and unreliable. Accordingly, she recommended that they be suppressed. The Government objects to this recommendation, arguing that the identifications were sufficiently reliable to be admissible even when they may have been suggestive. The Government argues that these witnesses were involved in multiple dealings with the defendant and demonstrated certainty at the confrontation.

After a thorough review of the record, however, the Court is not persuaded by the Government's proffer. The record shows that there were conflicting physical descriptions of "Manolo" from CS Diaz and Agent Alverio; that in 2000 or 2001, CS Ortiz, who did not provide a description of "Manolo" at the time of his arrest in 1998, was shown a single photograph of the defendant; that in the summer of 2003, CS Diaz, who alleges to have seen "Manolo" in several occasions between December 28 and 31, 1998, was also shown a single photograph of the defendant, allegedly taken from his driver's license; that CS Diaz led law enforcement personnel to a residence he claimed to be "Manolo's" which was registered to the defendant, but no showing has been made that it was under the defendant's exclusive control at the time of the alleged offense; that CS Diaz provided hearsay information regarding "Manolo's" participation in the drug-smuggling venture; that CS Diaz gave conflicting descriptions of "Manolo" in 1998 and in 2003; and that it is through an as yet unidentified confidential source, who

has since been deactivated and who had no participation in the 1998 drug-smuggling venture, that government agents learned of "Manolo's" alleged involvement in that conspiracy.[2]

First, the Court agrees with the Magistrate–Judge that the showing of a single photograph is impermissibly suggestive. *United States v. de Jesus–Rios,* 990 F.2d 672, 677 (1st Cir.1993). In this case the two confidential sources who identified the defendant as "Manolo" were each shown only one photograph. Furthermore, the Magistrate–Judge, stated she was hard pressed to see the similarity between the defendant and the photograph of "Manolo" shown to CS Diaz. Second, CS Diaz's identification of the defendant as "Manolo" was made four and a half years after the alleged offense. The time elapsed between the two renders the identification highly unreliable. Third, CS Diaz gave two conflicting descriptions of "Manolo", one in 1998 and one in 2003. And fourth, although the Government proffers that the witnesses showed certainty at the confrontation, there is no testimony on the record of anyone who was present at that moment. Thus, there is no support on the record for the Government's assertion and it can be classified as merely an argument of counsel.

Looking at the totality of the circumstances, the Court agrees with the Magistrate–Judge that the pretrial identifications made by CS Diaz and CS Ortiz are unreliable and must be suppressed.

As to the in-court identifications, the Magistrate–Judge found that the request was premature but recommended that, given the suggestive nature of the pretrial identifications, the Court fashion conditions within the trial setting that would ensure the correctness of any in court identification. The defendant objects, arguing that any in-court identification would be tainted by the impermissibly suggestive pretrial identification and should also be suppressed.

■ "A conviction based on identification testimony that follows a pretrial identification violates the defendant's constitutional right to due process whenever the pretrial identification procedure is so 'impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Ledbetter v. Edwards,* 35 F.3d 1062, 1070 (6th Cir.1994)(*quoting Thigpen v. Cory,* 804 F.2d 893, 895 (6th Cir.1986)). "It is the likelihood of misidentification that violates the defendant's due process right." *Id.* (*citing Neil,* 409 U.S. at 198, 93 S.Ct. 375). If a court finds that "the pre-trial identification procedures were unduly suggestive of the suspect's guilt, the court must then weigh the suggestiveness of the pretrial process against factors suggesting that an in-court identification may be independently reliable rather than the product of the earlier suggestive procedures." *United States v. Maldonado–Rivera,* 922 F.2d 934, 973 (2d Cir.1990). In other words,

> because of the likelihood that the witnesses' in-court identifications [are] based on their observations of the defendant at the [impermissibly suggestive proceeding] rather than at the scene of the crime . . ., this testimony should [be] excluded unless the prosecution [can] "establish by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other that the [suggestive] identification."

---

2. It should also be noted that during his testimony in Mercado's Trial in July 2001, CS Diaz made no mention of "Manolo" in his account of the conspiracy and its participants (Docket No. 77, Exhs. 1 & 2). In fact, he actually testified to not knowing who had bought the boat engines (*Id.*, Exh. 1, p. 219).

*Moore v. Illinois,* 434 U.S. 220, 225, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977)(*quoting United States v. Wade,* 388 U.S. 218, 240, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967)).

■ In this case, any in-court identification of the defendant during trial would presumably be made by either CS Diaz, CS Ortiz, or one of the government agents. Given the unreliability of the pretrial identifications made by CS Diaz and CS Ortiz, it is reasonable to believe that any identification they could make of "Manolo" at this stage would be impermissibly influenced by the single photograph of the defendant that they were shown during the suggestive procedure. Furthermore, given the amount of time that has passed since the alleged offense, an identification based on their observations back in December 1998 would be highly unreliable. Upon review of all the evidence on the record, the Court has serious doubts that an independently reliable basis exists for these confidential sources to identify "Manolo" over six years after the alleged offense. Accordingly, any in-court identifications made by CS Diaz and CS Ortiz must be suppressed.

On the other hand, the identification of the defendant as "Manolo" by one of the government agents would also be influenced by the suggestive procedures. It is through CS Diaz and CS Ortiz that the government agents claim they were able to identify the defendant as "Manolo". Having found that the identifications made by them are unreliable, it follows that the agents' ability to identify "Manolo" also suffers from the same malady. Furthermore, the agents have undoubtedly seen pictures of the defendant which could lead them to erroneously identify him as "Manolo". Therefore, since the Government has proffered no convincing evidence to show that an independent basis exists for the agents to identify the defendant as "Manolo", any in-court identification by government agents must also be suppressed.

### CONCLUSION

For the foregoing reasons, the Court **ADOPTS** in part and **REJECTS** in part the Magistrate–Judge's Report and Recommendation. Accordingly, the Court **DENIES** without prejudice defendant's motion to dismiss the indictment and **GRANTS** defendant's motions to suppress.

IT IS SO ORDERED.